STEWART v. MICHIGAN CENTRAL RAILROAD CO.

1. RAILROADS—CROSSING ACCIDENT—SIGNALS—WITNESSES.

In an action for the death of plaintiff's intestate in a collision at a railroad crossing, three of the train crew testified positively to the giving of the proper crossing signals, and were supported in this respect by two of plaintiff's witnesses. The only testimony relied upon by plaintiff as raising an issue for the jury was that of certain witnesses who testified that they did not hear the signals, but who admitted that they were occupied with other matters, and were not in positions favorable to hearing them, and the confused and uncertain testimony of a child 11 years old. *Held*, that the jury should have been instructed that the signals were given.

2. SAME—CONTRIBUTORY NEGLIGENCE.

One who drove upon a railroad track without stopping to look or listen, and was killed by a train which duly signaled its approach, was guilty of such contributory negligence as will bar a recovery by his administratrix, where he was familiar with the crossing, and might have seen the train had he stood up, or heard it if he had listened.

3. SAME—GROSS NEGLIGENCE—EVIDENCE—INSTRUCTIONS.

An instruction that defendant might be found guilty of gross negligence, permitting a recovery notwithstanding the contributory negligence of plaintiff's decedent, if the jury should find that defendant's train, at the time of the accident, was running at the rate of 25 miles an hour, was unwarranted, where the testimony was conclusive that the train could not have been stopped within the distance in which it was stopped had its speed much exceeded 12 miles an hour.

Error to Saginaw; Snow, J. Submitted October 18, 1898. Decided December 28, 1898.

Case by Mary Stewart, administratrix of the estate of Thomas M. Stewart, deceased, against the Michigan Central Railroad Company, for negligently causing the death of plaintiff's intestate. From a judgment for plaintiff, defendant brings error. Reversed.

*Watts S. Humphrey*, for appellant.

*John F. O'Keefe* (*George W. Weadock*, of counsel), for appellee.

LONG, J.   Plaintiff's intestate was killed on February 5, 1898, by being run over at the Sheridan-avenue crossing, in the city of Saginaw, by a passenger train of defendant.   Deceased was 35 years of age, possessing all his faculties, and a resident of the city.   Sheridan avenue crosses the railroad track at right angles in the heart of the city, and is traveled by a great many teams daily. The track extends for some distance nearly parallel with Atwater street, and crosses Sheridan avenue 64 feet south of where Atwater street crosses Sheridan avenue.   The deceased kept a grocery store at the corner of Holland and Sheridan avenues, 3 blocks from the corner of Sheridan and Atwater streets, and a little more than 2½ blocks south of this crossing.   He resided over his store with his family, and had been in business at that place about two years, and was perfectly familiar with this crossing. On the south side of Atwater street, and at the southeast corner of Atwater and Sheridan streets, was a store kept by Mr. Lazelle.   It was a one-story wood building, extending back towards the railroad crossing.   On the day of the accident, the deceased had driven up to the Lazelle store with his horse and delivery sleigh, and left his horse standing on the crosswalk, facing the railroad crossing, on Sheridan avenue.   Decedent went into the store to get a bill changed.   While in the store, three ladies came across Sheridan avenue, and got into his sleigh,—one of them upon the seat, and the other two in the box behind the seat.   When the deceased came out of the store, he got into the sleigh, and fixed the blankets around himself and the women, at the same time starting his horse on a walk towards the railroad crossing, 64 feet away.   The horse gradually increased his gait to a slow jog, until just before going onto the railroad track he made a sudden start ahead, and was almost across the track when the engine

struck between the horse and the sleigh, killing plaintiff's intestate and all the other occupants of the sleigh. The evidence is undisputed that the decedent did not stop the horse from the time it started until the accident happened.

The negligence alleged in the declaration is—

(1) That the defendant failed to ring the bell or blow the whistle.

(2) That it was running its train at a high and dangerous rate of speed.

(3) That it failed to erect safety gates at that crossing, and failed to keep a watchman there.

—And that each of these several acts was gross negligence.

The court charged the jury upon these questions as follows:

"The plaintiff alleges in her declaration filed in this cause that it was the duty of the Michigan Central Railroad Company to maintain and operate a safety gate at the Sheridan-avenue crossing, or to maintain a flagman to signal the public passing over said crossing the approach of trains. The plaintiff claims that one or the other of these precautions was required upon the 5th day of February last, at the intersection of the defendant's tracks with Sheridan avenue. The proof is undisputed that neither a gate nor a flagman was maintained at this crossing upon the 5th of February last. It is not the law of this State that at every road or street crossing in a city a railroad company is bound to place a flagman or to maintain a gate. The absence of a flagman or a gate at the Sheridan-avenue crossing, where this collision occurred, is of itself no evidence of negligence upon the part of the railroad company. In order for the absence of a flagman or the maintenance of a gate at this crossing to constitute negligence upon the part of the defendant, you must find that the circumstances surrounding this cross-. ing were such that common prudence would dictate that the railroad company should place a flagman there, or a safety gate, or its equivalent. I charge you that if you find that by reason of the obstructions at this crossing, in view of the testimony taken at this trial, the danger at . the Sheridan-avenue crossing was altogether exceptionally great,—that there was at all times a large amount of public travel over this crossing,—then I charge you that it

was the duty of the railroad company to maintain a safety gate or a flagman at this crossing, and its failure to do so was negligence.

" Even though you should find the defendant was negligent, the plaintiff cannot recover in this case, unless you find either that Thomas M. Stewart, the deceased, was not guilty of contributory negligence, or, if you should find that he was guilty of contributory negligence, then, in order for the plaintiff to recover, you must find that the railroad company was guilty of gross negligence. Unless the defendant was guilty of gross negligence, under the law of this State, in order to entitle the plaintiff to recover, the deceased, Thomas M. Stewart, must have been in the exercise of due and ordinary care and caution while approaching and driving upon said tracks at the time he was killed. In order for the 'plaintiff to recover, unless you find that the defendant was guilty of gross negligence, you must find that Thomas M. Stewart, deceased, was cautious in approaching and driving upon the railroad tracks; that he looked and listened, and took such precautions as an ordinarily prudent person would have taken under the circumstances; and it is for you to determine, as a question of fact, whether he took all of the precautions, in view of the surroundings, that an ordinarily prudent person would have taken under the same circumstances. Some testimony has been introduced tending to show that one or more boys in the vicinity of the crossing warned the deceased of the incoming train while the deceased was approaching the railroad tracks. I charge you that, unless the deceased heard and understood this warning, the failure to obey this warning was not negligence.

" The plaintiff further claims that the defendant was guilty of gross negligence, which resulted in the death of her intestate. The term ' gross negligence,' when referred to as authorizing a recovery for a negligent injury notwithstanding the contributory negligence of the plaintiff, means an intentional failure to perform a manifest duty, in reckless disregard of the consequences, as affecting the life or property of another. It also implies a thoughtless disregard of consequences, without the exertion of any effort to avoid them. It is undisputed in this case that, at the time of the collision between the defendant's passenger train and the sleigh in which Stewart was riding on the afternoon of February 5th last, there was a large

amount of public travel on Sheridan avenue, where Mr. Stewart was killed; that there was no safety gate or watchman at this crossing; that there was a curve in defendant's railroad tracks, and that its tracks were down grade, going westerly; that on the left-hand side of Sheridan avenue, going south, between Atwater street and the Michigan Central tracks, there is more or less obstruction by the store, sheds, outbuildings, and fences, which interfere with a ready view of trains coming on defendant's tracks from the east, and that in the vicinity of this crossing the city is well built up; that the defendant's passenger train was 24 minutes late when it left the F. & P. M. crossing, a short distance to the easterly of where the collision took place; that an ordinance of the city of Saginaw prohibits a higher rate of speed within the limits of the city than six miles an hour; and that the instructions of the defendant company to its employés in charge of train No. 203 were to make the distance between the F. & P. M. Belt Line crossing and Washington-avenue stop, a distance of some two miles, which includes the point at which the collision took place, at a rate of 21 miles an hour. I therefore charge you, as a matter of law, that if, from the evidence, you find that the defendant, in running its passenger train No. 203, where it crosses Sheridan avenue, ran it at a rate of 25 miles an hour, or upwards, without having twice sharply sounded its steam whistle at least 40 rods before the crossing on Sheridan avenue was reached, and after sounding its whistle did not ring the bell on its engine continuously until the crossing was passed, then the defendant would be guilty of a reckless disregard of the safety of persons traveling on Sheridan avenue, which amounted to gross negligence, and the plaintiff is entitled to recover, even though you should also find from the evidence that the deceased himself was not free from negligence."

Plaintiff had verdict and judgment for $5,000.

1. It is contended that the court was in error in leaving to the jury the question whether the whistle was blown and bell sounded. The conductor, engineer, and fireman, witnesses for the defendant, testified positively to the blowing of the whistle for the several crossings, and the engineer and fireman testified that the bell was ringing continuously from Vassar until the train was stopped after

the happening of the accident. A witness for the plaintiff (one Fred Harnish) testified that he stood where he saw the train cross Warren avenue. He was on the corner of the street there. He says the whistle was blown after the train crossed Warren avenue, and that the bell at that time was ringing as the train passed along, going westward. Warren avenue, it is conceded, is about 636 feet east of the Sheridan crossing. Charles Lazelle,˙ a witness for the plaintiff, testified that he stood in front of his father's house, a distance about 100 feet south of the railroad crossing,. and heard the whistle sounded "above Warren avenue." Gertrude Lazelle, a witness for plaintiff (a sister of the last witness, and a girl of 11 years of age), stood near her brother. On cross-examination she was asked: "You heard the train whistle somewhere away up by Ward or Warren avenue, did you not? A. Yes. Q. And you looked up, and saw Mr. Stewart just getting into the sleigh, was he not? A. Yes." She had testified on direct examination that she heard the two danger signals just before the train reached Sheridan avenue. On redirect examination she explained that the whistle she meant in answer to the question from defendant's counsel was the danger whistle just before the train reached Sheridan avenue. Mrs. Rose Meader, a witness for plaintiff, testified she was sitting in her room, with the doors and windows closed, reading a book, and that she did not hear the whistle. Her house is on Sheridan avenue, next south of the Lazelle house. She says she heard the two short whistles just before the accident, but did not hear any other. Mr. Thomas J. Patterson, also a witness for plaintiff, testified that he was inside the Lazelle store. He was employed there. On˙redirect examination he was asked: "State whether or not you usually heard the whistle of the train." This was the first his attention had been called to that subject. He answered:

"Well, sometimes I had. That depends. If I was busy, why probably I wouldn't notice it; but the door was a little— I didn't hear any whistle, nor I didn't hear any

bell; but, of course, I couldn't judge for that, being used to it." :

This constitutes the substance of all the ·testimony relating to the ringing of the bell or the blowing of the whistle, from which it is seen that the conductor, engineer, and fireman testified positively that the whistle was blown at Warren avenue, and the bell sounded continuously; that these witnesses are supported by two of plaintiff's witnesses, Mr. Harnish and Charles Lazelle; that the testimony of the girl, Gertrude Lazelle, was confused and uncertain, and, at most, only that she heard the danger signals, but not the one at the Warren crossing; that the testimony of Mrs. Meader and Mr. Patterson was entirely negative, both being within buildings, and with faculties otherwise directed,—she reading, and he busy with his duties in a store, with doors and windows closed against sound.   Should such testimony have any weight in determining the question whether the whistle was sounded and the bell rung as the statute provides?   Who would give it any weight in the ordinary affairs of life, in contradiction to the positive testimony of other credible witnesses?   All that can be said of it is that these persons did not hear the whistle or bell because they were not in a position to hear, and were giving the matter no attention whatever.   This is not the first case that has come before us involving the question here raised, but in no case has the negative testimony been so weak as here.   The witnesses who gave it do not claim to have been listening, or that if the whistle had been sounded, or the bell rung, they would have heard it.   If this testimony raised a question of fact for the jury, we can imagine no case that should not be submitted when witnesses are called, and claim they did not hear the bell or whistle, though they were in no position to hear, or were giving no attention ·whatever to the matter.   This is a much weaker case upon the facts for the plaintiff than was *Culhane* v. *Railroad Co.*, 60 N. Y. 137.   In that case it was said:

"It is proved by the positive oath of the two individuals on the engine, one of whom rang it, and by two others, who witnessed the occurrence and heard the ringing of the bell. The two witnesses for the plaintiff merely say they did not hear the bell, but they do not say that they listened, or gave heed to the presence or absence of that signal. * * * As against positive, affirmative evidence by credible witnesses to the ringing of a bell or the sounding of a whistle, there must be something more than the testimony of one or more that they did not hear it, to authorize the submission of the question to the jury."

Counsel for defendant asked the court to charge the jury that, under the undisputed evidence, they must find that the whistle was sounded and the bell rung. This request should have been given.

2. It is contended that the plaintiff's intestate was guilty of contributory negligence in driving upon the track in the manner in which the testimony shows he did. It has been stated that, when he got into the sleigh, his horse started on a walk, and increased his gait to a slow jog until he got to the track, when he made a sudden start ahead. The testimony shows that the Lazelle store extends back along Sheridan avenue about 33 feet, with a shed extending about 8 feet farther back. Extending from the rear of this shed to within 11 feet of the north rail of the railroad track is a board fence, with boards standing up and down, and about 5 or 6 feet high. There is also a fence of about the same height extending along the side of the track to the eastward, being the back fence to the lot. At the back end of the lot, and about 26 feet east from Sheridan avenue, is an outhouse, 8 feet one way by 4½ feet, leaving a space of a little over 10 feet between the line of the shed back of the store and the outhouse. It is shown by the testimony that, after passing the Lazelle store and shed, a person walking on Sheridan avenue, if he were tall enough to look over the fence, could see through this space of 10 feet a train, if one were coming, about three-fourths of a block to the eastward. Charles Lazelle and his sister, Gertrude, together with John Murphy and Enos

Brennan, stood near the Lazelle house, 100 feet south of the crossing. These boys were playing there. They heard the danger whistle, saw the train coming, and understood the decedent's danger in approaching the crossing. They called loudly for him to stop. One of the boys waved his hands and tried to attract his attention, but he kept on, without apparently hearing or seeing them. There is no evidence that he stopped or listened for the approach of the train. The witness Patterson testified that, when the decedent went out of the store, he checked himself on the porch, but why he did this is not known. That was about the time, the witnesses say, that the train whistled at Warren avenue. The testimony differs as to the conduct of the decedent while in the sleigh, and driving towards the crossing. Some of the witnesses say that he turned his head towards the east, while some say he was looking backward into the sleigh. It is shown that, sitting on the seat in the sleigh, the decedent could have looked over this fence, and seen a train coming a short distance away. Just how far is not shown. It is apparent, however, that had he stood up in the sleigh and looked before entering upon the track, and while some 20 feet away from it, he could have seen down the track nearly three-quarters of a block. He knew the situation there. He was familiar with the crossing. Trains crossed there frequently. Had he exercised such care as is required in such situations, he would have known of the approach of the train. The case is very similiar to that of *Phillips* v. *Railway Co.*, 111 Mich. 276 ( 66 Am. St. Rep. 392). It was there said :

"The plaintiff, if he could not see an approaching train by reason of these obstructions, was bound to use greater precautions in nearing the track. * * * If he had stood up in his carriage, and looked westward, he could have seen over the hen-house and the pile of ties, and have seen the train when it was some 1,200 feet away."

In the present case the decedent could have seen over the fence by standing up in the sleigh. He did nothing,

stopped at nothing, but got into the sleigh, started his horse forward into a jog, and drove to his death, and the death of the others who were with him. If the view was so obstructed that it was impossible to see the approach of the train until entering upon the track, then it was certainly the duty of the decedent to have stopped and listened for the train. *Lake Shore, etc., R. Co.* v. *Miller*, 25 Mich. 290; *Haas* v. *Railroad Co.*, 47 Mich. 407; *Brady* v. *Railroad Co.*, 81 Mich. 621; *Van Auken* v. *Railway Co.*, 96 Mich. 307 (22 L. R. A. 33); *Shufelt* v. *Railroad Co.*, 96 Mich. 329; *Houghton* v. *Railway Co.*, 99 Mich. 310; *Jensen* v. *Railroad Co.*, 102 Mich. 180. In the last-named case it was said:

"If it was a fact that the plaintiff, as he testified, could not see an approaching train for $128\frac{1}{2}$ feet, it was clearly his duty to stop and listen."

3. It is claimed that the train was not running at a great rate of speed. The witnesses differ as to the rate it was running. The defendant's witnesses place the speed not to exceed 12 to 15 miles an hour. Some of plaintiff's witnesses estimate it at a much greater speed. It is shown conclusively, however, that the train was on down grade, and yet was stopped, after the accident happened, so that the center of the last coach stood in the center of Sheridan avenue; and the testimony is conclusive that, if going at a much greater rate than 12 miles an hour, it could not have been stopped within that distance. The court was therefore in error in submitting to the jury the question of gross negligence. There was no evidence to warrant such charge.

Under the evidence as shown by this record, the jury should have been directed that no recovery could be had.

We need discuss no other questions. The judgment below must be reversed, and a new trial awarded.

The other Justices concurred.