BOND *v.* LAKE SHORE & MICHIGAN SOUTHERN RAILWAY CO.

RAILROADS—ACCIDENT AT CROSSING — SIGNALS — WEIGHT OF EVIDENCE—NEW TRIAL.

> Where, in an action for injuries caused by a collision at a railroad crossing, the negligence alleged was a failure to give the statutory signals, and there was the testimony of seven witnesses, including those in charge of the train, that the signals were given, as against the sole testimony of the plaintiff, a woman partially deaf, who, at the time of the accident, was sitting in a closed carriage, and whose testimony was in several respects contradictory of that given by her on a former trial, a motion to set aside a verdict in her favor, and grant a new trial, on the ground that the verdict was against the weight of the evidence, should have been granted.

Error to Washtenaw; Kinne, J.   Submitted October 22, 1901.   Decided November 4, 1901.

Case by Hattie M. Bond against the Lake Shore & Michigan Southern Railway Company for personal injuries.   Verdict and judgment passed for plaintiff, and, defendant's motion for a new trial having been denied, it brings error.   Reversed.

*C. E. Weaver* ( *George C. Greene* and  *O. G. Getzen-Danner*, of counsel ), for appellant.

*Lehmann Bros. & Stivers*, for appellee.

GRANT, J.   This case is before us for the second time. See 117 Mich. 652 (76 N. W. 102), for a sufficient statement of the case.   It has been tried again, resulting in another verdict for the plaintiff.   We held that, under the evidence appearing upon that trial, the court should have directed a verdict for the defendant.   The situation and the facts elicited are substantially the same now as then.   Plaintiff is the only witness who has made any substantial change in her testimony.

128 MICH.—37.

Was the defendant negligent? The negligence relied on is the failure to give the crossing signals. We said upon the former trial that there was no conflict in the evidence upon this point. Defendant introduced two new witnesses who swore positively that they heard the crossing signals given, and very quickly thereafter heard the alarm whistle given. The sole testimony relied on to sustain the verdict of the jury is that of the plaintiff and the boy Ukle. The boy's testimony is the same as before. Upon this trial he testified:

"The first thing that attracted my attention was the alarm whistle, and I had not been paying any attention to the train until I heard that.

"*Q.* You do not know whether the crossing signals were given or not?

"*A.* No, sir. I know where the whistling post is, about halfway to our house.

"*Q.* You do not know whether they whistled there or not, do you?

"*A.* No, sir; I did not pay any attention to it."

Plaintiff gives the only testimony relied upon to take the question out of the former decision of this court and leave it a question for the jury. She testified upon the second trial that she was familiar with the signals that trains give at crossings. She was then asked:

"*Q.* State whether any such signal as that was given for that crossing that day.

"*A.* There was not."

Her testimony upon the former trial is as follows: Cross-examination:

"*Q.* From your recollection, can you state whether the bell was rung or not?

"*A.* I could not tell whether the bell was rung or not."

Re-direct examination:

"*Q.* Do you understand he is calling your attention to what occurred at the crossing or at the station?

"*A.* I could not hear anything at the crossing where I was struck.

"*Q.* But just before you were struck, and after you saw the train, you say you first heard the whistle, and then the alarm whistle?

"*A.* Then the alarm whistle.

"*Q.* To the time you saw the train was the bell rung?

"*A.* I could not tell whether the bell was rung or not. When I saw the train I was listening.

"*Q.* Then can you state that the bell at the time you were listening was not rung?

"*A.* I could not say it was not rung, but the alarm whistle made such a frightful noise I could not think of anything else.   But that bell might have been ringing. I might have heard it at the same time.

"*Q.* But, if the bell had been ringing before you heard the alarm, would you have heard it?

"*A.* I should.

"*Q.* Was it ringing before you heard the alarm?

"*A.* I did not hear it."

Upon this trial she testified that she did not know whether the bell was rung.   Upon the former trial she testified she did not stop, but slowed up as she approached the track, and all the other witnesses who saw her corroborated her.   These witnesses so testified upon the second trial.   Upon the second trial she testified that she did stop just as she reached the line of the defendant's right of way, and looked and listened.   She was riding in a buggy with closed sides and back.   She was quite deaf in her left ear,—the one nearest the train.   Her testimony upon the two trials is so contradictory that it is impossible to reconcile it.   The situation is this: Seven witnesses, including those who gave the signals, swore positively that they were given.   Plaintiff alone testified that the whistle was not blown, but that she did not know whether the bell was rung.   A woman, partially deaf, sitting in a closed buggy, with the noise made by her carriage, is allowed under this record to outweigh the testimony of seven positive witnesses.   Her testimony, under such a state of facts, does not rise to the dignity of evidence.   *Britton* v. *Railroad Co.*, 122 Mich. 359 (81 N. W. 253).   Such a verdict is not based upon evidence, but

upon either prejudice or sympathy. The language used in *Baldwin* v. *Railway Co., ante,* 417 (87 N. W. 380), is applicable here. See, also, *County of Montmorency* v. *Putnam,* 127 Mich. 36 (86 N. W. 398).

Was plaintiff guilty of contributory negligence? She testified upon the former trial that she heard the whistle of the train when it left the station. The engineer then testified that he did not know whether he blew the whistle as the train started, but it was not customary to do so. The train consisted of 16 freight cars. The engine, when it started, stood between 1,900 and 2,000 feet from the crossing. She was then between 250 and 280 feet from the crossing. On the second trial she testified that she heard no whistle then, but did hear the puffing of the engine and the ringing of the bell as the train started from the station. She also testified upon the former trial that she heard the rumble of the train after it left the station. She heard all these sounds while riding in a closed carriage, with the train nearly 2,000 feet away. Upon the second trial she testified that she stopped upon reaching the line of the right of way, but heard nothing, although the train could not have been over 400 or 500 feet from her. If she heard the puffing of the engine, the ringing of the bell, and the rumbling of the train when she was from 250 to 280 feet from the crossing, it is impossible to believe that she would not have heard the train if she had stopped at the line of the right of way. The undoubted fact is, as she testified upon the first trial, and as all the other witnesses who saw her testified both upon that trial and upon this, that she did not stop. If, however, it be assumed that her testimony is true, and that her vision was obstructed from Ukle's house to the railroad, while she was standing at the right of way, so that she could not see the approaching train, what was her duty under the circumstances? The train was on time. She knew that it was either on this road or on the Ann Arbor road, but did not know which. There was nothing to induce the belief that it was on one road rather than the other. She had no right to assume that

it was on the other road.  It was her duty, if she could not see, to stop and ascertain, before attempting to cross, whether the train was on the track which she was approaching.  This she could have determined by a wait of two or three minutes at the longest, without alighting from her carriage.  According to her theory, the trainmen could not see her, neither could she see them.  They could not know she was approaching.  She might have known, by the exercise of reasonable care, that they were approaching.  She could stop, as it was her duty to do. The train could not.  The engineer was not called upon to attempt to stop until he saw her, and saw that she was in peril.  The train was running at a lawful rate of speed, and no claim is made that the trainmen did not use all possible effort to avoid the accident when they saw she was in danger.  Where two railroads were 264 feet apart, and a person approaching very much in the same manner as this plaintiff was approaching saw the smoke of an approaching train several hundred feet distant, and supposed it was on the farther track, instead of the one nearest to him, and drove on under that belief, we held that he was guilty of contributory negligence, and that it was his duty to stop and ascertain which road the train was on before he attempted to cross.  *Brinker* v. *Railroad Co.*, 121 Mich. 283 (80 N. W. 28).  If it was the duty of plaintiff to so act in that case, a like duty devolved upon the plaintiff in this case, who heard the train, and knew it was on one of two roads, but could not tell which without stopping.  The noise of a moving train was as much a warning to her in this case as was the smoke of a moving train to the plaintiff in that.  A wait of two or three minutes, as above stated, would have solved the question for her, and saved her injury.  It was her duty to wait.  I am of the opinion that she was herself negligent.  The judge should have directed a verdict for the defendant.

.Judgment reversed, and I think that no new trial should be ordered.

HOOKER, J.   We are of the opinion that the judgment should be reversed and a new trial ordered upon the ground that the verdict was contrary to the weight of the testimony.

MONTGOMERY, C. J., MOORE and LONG, JJ., concurred with HOOKER, J.