TIETZ v. GRAND TRUNK RAILWAY CO. OF CANADA.

RAILROADS—CROSSING NEGLIGENCE—TRIAL—EVIDENCE — CONTRIB-
UTORY NEGLIGENCE.

Plaintiff was struck by an engine of defendant at a crossing, and testified that he stopped twice before crossing the track, that it was dark and a strong wind was blowing, and that he heard no signals, saw no train coming, and heard no rumbling of the train. Several of his witnesses corroborated his testimony as to the light and signals. Two witnesses testified that the train was running from 40 to 50 miles an hour. Defendant's witnesses disputed all such testimony, and as to the ringing of the bell, defendant's trainmen testified positively that it was ringing, and the engineer gave evidence that he blew the whistle at all the crossings but did not know the

one in question. It was undisputed that the only light at the rear of the engine as it backed up was a hand lantern. *Held,* that the plaintiff's testimony was not of such negative character and defendant's proofs so positive as to take the case from the jury, and that plaintiff was not guilty of contributory negligence as a matter of law.

Error to Macomb; Tappan, J., presiding. Submitted April 17, 1911. (Docket No. 54.) Decided June 2, 1911.

Case by John Tietz, by next friend, against the Grand Trunk Railway Company of Canada. Judgment for plaintiff. Defendant brings error. Affirmed.

*Harrison Geer,* for appellant.

*William T. Hosner* (*John A. Weeks,* of counsel), for appellee.

STONE, J. John Tietz, a minor who was just past 17 years of age at the time the injury complained of occurred, brought suit, by next friend, against the defendant to recover damages as compensation for personal injuries sustained by him through the collision of the buggy in which he was riding along the Hadley road, so called, in the township of Armada, Macomb county, at a point where said highway crosses the Michigan Air Line Railroad, a single-track railroad operated by the defendant, and the engine and tender running backward in a westerly direction over such railroad at substantially 8 o'clock on the evening of November 4, 1908. Hadley road extends in a northeasterly and southwesterly direction, and the railroad track also extends in the same direction, but the highway runs much more to the north and south than does the railroad. There was one house along this highway, which was located substantially 300 feet north of the point of intersection of the highway with the railroad, and upon the east side of the highway. Passing south from the house along this highway for the first 150 feet, or thereabouts, it is level with the adjacent land. Then there had been a cut

making an embankment on the east of the highway of about six feet in depth, and it extended to within about 40 feet of the northerly rail of the defendant railroad. There were on the westerly side of the highway, and north of the track, several acres of elm trees. The land upon which these trees stood was much lower than the highway. The railroad for about 30 rods east of the Hadley road crossing runs through a cut of about the same depth as is that along the easterly side of the highway.

The engine in question left Jackson pulling a stock train by way of Lennox for Detroit. The train reached Romeo at substantially 6:30 o'clock. After doing some switching there, the engineer discovered that he did not have sufficient water in the tank to haul the train to Armada, the next station east. There being no means of taking water at Romeo, the conductor cut off the six forward cars from the remainder of the train, and the engineer, fireman, and forward brakeman went to Armada with so much of the train. Arriving there, these six cars were placed on a siding. The tank was filled with water, and they started to return to Romeo for the remainder of the train at about 7:45 p. m. There being no turntable at Armada, it was necessary, in going from Armada to Romeo, that the engine and tender run backward. The fireman placed an ordinary railroad hand lantern upon the westerly end of the tender. It threw a white light. There were brackets upon the manhole into which to slide said lantern, which brackets held it securely. It is claimed by the defendant that the lantern was so placed in compliance with the rule of the company.

In view of the fact that the plaintiff is the only witness who testified to the circumstances surrounding the collision, we deem it proper to insert the substance of his testimony as to the injury. Testifying as to the approach from the north, and speaking first of the point 150 feet from the crossing, the plaintiff said:

" You can see back I should say, I don't know about the night, but in the daytime you can see from the top of

the hill back maybe about 40 rods from the top of the hill.
* * * You cannot see anything to the west on account
of the woods at that point. When I reached that point,
I knew the railroad track was there, and I didn't really
expect a train at that time, but I looked out for it as I al-
ways do when I go across the track. I was alone. The
only thing I was thinking about was that the track was
there and I was coming to the crossing of it at that time.
I was driving a farm horse which we worked in a team.
I had a top buggy with the top half down. The top would
not interfere at all with my looking ahead; I could see
both ways. I was wearing a little skull cap. There was
no earlap on it. I had on my coat. This was turned up.
It wasn't tight to my ears, and wouldn't interfere with my
hearing in any way. When I was within 150 feet of the
track, I stopped my rig over the hill. I didn't see or hear
anything, so I started my horse and let him walk. I came
to a complete stop, and looked in both directions as far as
I could see. I could see nothing and hear nothing. I
heard no bell or whistle from the locomotive or rumbling
of approaching train. After leaving that point, I pro-
ceeded along the highway towards the railroad track. I
walked my horse the distance from that point to the rail-
road track. All that I had on my mind was that I was
going to cross the track there. When the horse's head
was within eight or ten feet of the track, I stopped the
horse, leaned ahead in the buggy, and looked both ways
and listened. I saw and heard nothing, so I started the
horse and drove on, and just as I got on the track is the
last thing I remember. I was struck and became uncon-
scious. I stopped when the horse was eight or ten feet
from the track just long enough to look both ways. I
think that I would be back six or seven feet further when
I was sitting in the buggy, possibly 14 or 15 feet from the
north rail. When I stopped the last time, the horse was
in the center of the highway, and, if it had been daytime,
I could have seen a thousand feet in either direction from
that point. There was nothing to obstruct the view ex-
cept the fence and the posts, and they would not obstruct
the view of one standing in the position I was. As you
go further north the bank and the trees obstruct the view
so that you could not see in either direction. I looked in
both directions very carefully and listened very carefully.
I observed nothing at all. The only thing I saw of the
train that struck me was just a kind of a flash; kind of

scared me for a minute.  That is all I saw.  I didn't see anything of any light.  I didn't see any headlight or look-out.  When I regained consciousness, I was down beside the cattle guards."

The buggy was literally smashed to pieces and strewn about the track.  The horse was found dead the next morning, about 75 feet from the crossing, on the south side of the track.  The plaintiff was so badly injured that it was necessary to amputate his left leg, and he was otherwise injured.  The plaintiff lay there unconscious until the return of the engine and its train, when it appears that some portion of the buggy was thrown against his face, arousing him, after which he made an outcry, and attracted the attention of a Mr. Farrand and family, who lived in the house north of the crossing already referred to.  The plaintiff testified that it was a very dark night, and that the wind was blowing from the north-west; that the branches of the trees came out near the railroad track and highway.  Plaintiff testified that before the accident he weighed 135 pounds, was in good health, and that his eyesight and hearing were good.  He further testified, on cross-examination, referring to the Farrand house:

"The road in front of the house is level with the surface of the ground; and, when you get within 150 feet south of the Farrand house, the road commences to decline.  The cut starts gradually and grows deeper.  I don't think that at any point after where I stopped at 150 feet back, if I had stopped again, I could have looked east and seen the train coming until I got down to the track.  That is the reason I didn't stop because I knew I couldn't see it on account of the bank.  I think that, when I stopped the horse, his feet were about eight or ten feet from the north rail.  I was in the buggy.  The nose of the horse was within eight or ten feet of the rail, so his feet were prob-ably ten feet from the track.  I stopped there.  I am not sure that as I sat in that buggy my head was six feet above the surface of the ground.  It was just an ordinary buggy, and I think my eyes would be about six feet from the ground.  I never measured it.  I remained there,

166 Mich.—14.

stopped there just long enough to look both ways up and down. I could not see anything, so I went on. I was careful to bring the horse to a stop so that the buggy wouldn't make any noise. There was some wind. I think I looked to the west first. I am not sure. I looked both ways. I looked very carefully. My horse was standing still. I saw no lights, and didn't hear the rumbling of any train. I drove forward until my horse must have been right on the track. * * * He walked, and, just as he got on the track, he was truck by the engine. I didn't see or hear anything of the train until the collision occurred. I never saw the engine at all until it came right against my horse. He was going just at an ordinary walk. From the time I stopped him about 150 feet back from the crossing I just let him walk down to the track. I trotted him until he got to that hill in front of Farrand's house. I knew that was a good place to look, and I could have seen if there was anything coming. I also knew that from that time up until I got down near the track I could not see anything at the east on account of the bank. That is the reason why I drove close to the track so as to be in a position to see. I say that at the point where I stopped the second time I could have seen a train in the daytime a thousand feet away."

When this engine and tender were east of the Hadley crossing, they were heard by several persons. Arthur Farrand, who lived in the house above mentioned, and his wife, had retired for the night. They occupied a bedroom situated at the southeast corner of the house on the ground floor. When the engine and tender were 50 or 60 rods east of the crossing, Mr. Farrand heard them. He got up, raised the curtain, and looked out of the window, as the noise continued to grow plainer. When the engine and tender were about 20 rods from the crossing, he observed that the fire box door was open. The reflection from the fire box lighted up the engine and tender. He observed that they were backing west. He testified that he saw no light upon the westerly end of the tender, and no headlight upon the engine. He did, however, observe the engine and tender by the reflection thrown upon them from

the fire box, the door being open until the engine was within five rods east of the crossing. He testified:

"During the time that the train was being observed by me, I didn't hear any whistle or bell. I was listening for those signals. If any whistle or bell had been blown or sounded, I would have heard it. I was listening real closely. I only heard the coming. It was something unusual, and we were listening to see what it was."

Mrs. Farrand testified that she did not get out of bed, but sat up, and that for some minutes before she saw the engine and tender pass her bedroom window she heard them approaching. She observed the reflection from the fire box as the engine passed her bedroom window.

Claud Webster, a brother-in-law of Mr. Farrand, was with his wife spending the night there. They occupied a bedroom at the northwest corner of the house on the ground floor, which bedroom was separated from the parlor by two folding doors. He testified that he was preparing to retire for the night and stood near these folding doors at the time he heard the rumbling noise of the approaching train. He stepped into the parlor, looked out of the bay window, and then saw the engine and tender. He testified that it was within 30 to 35 rods east of the crossing when he first heard it, and that at the time he first saw the engine it was about five rods from the crossing. As the train passed the crossing Mr. Webster saw no headlight burning; that is, he saw no light on the front end of the train as it was moving. He is very positive that he heard no bell or whistle from the time when he first heard the noise of the train.

One Frank Millard, a farmer living three-eights of a mile southwest of the Hadley crossing, and about 80 rods south from the railroad track, testified that he was at the northeast corner of his house at the time the engine and tender went west. He testified that he heard the engine and tender when near the Hadley crossing, and that, when he first saw them, he observed a flash of light. He described it as a "kind of reflection from the fire box when

they put in a fire. I did not observe any other lights."

Two young men, Carl and Gilbert Ganfield, who were from a mile and a half to two miles west from the Hadley crossing, observed the engine and tender as they passed west near them. The first of these witnesses, Carl, testified that he did not notice whether the train had a headlight on or not. He did not observe any. He simply heard the noise, saw the light, and knew it went by. He heard no whistle or bell. Gilbert testified that the light which attracted his attention looked as though it was from the open fire box; that the train passed within 10 rods of him, and he observed no lights upon the train, besides the light from the fire hole; that he had a side view of the train and observed no light before the train passed. He heard no bell, whistle, or signal given by the engine. The plaintiff's witnesses above mentioned testified that it was a dark night, and a strong wind was blowing from the northwest.

Dr. Traphagan, the physician, who was called about 11 o'clock at night to attend the plaintiff, and who traveled from the village of Armada, some two or three miles distant, testified that it was a dark night. On the other hand, the person in charge of the United States weather bureau at Detroit testified from his records that the moon was three-quarters full, and that it was a clear night in Detroit, and that, under existing conditions, there would be little or no cloudiness in the southeast portion of Michigan; and that it followed from the existing conditions that the night at Armada, was clear. This testimony was corroborated by the person in charge of the United States weather bureau office at Grand Rapids. The engineer, fireman, and brakeman in charge of the engine and tender testified that it was a clear, bright night, and yet they did not know that any accident had happened until the next morning; and, although they went to Romeo after the collision and returned an hour later, they neither observed the wreck of the buggy, the plaintiff in his injured condition, nor the dead horse lying near by.

The engineer, fireman, and brakeman testified that the engine was running not to exceed 17 miles an hour. Two witnesses produced by the plaintiff testified that in their judgment the engine was running 40 to 50 miles an hour.

Upon the subject of signals, the engineer testified that as he started to go back from Armada to Romeo he set the engine bell ringing, that this was an automatic bell, and that the bell continued to ring all the way from Armada back to Romeo, and until they stopped at Romeo. With reference to the whistle, the engineer testified:

"I blew the whistle after leaving Armada for Romeo at the different crossings. A crossing whistle is two long and two short blasts. They are blown at the whistling posts. I don't know the Hadley crossing by name, but they said the second crossing the other side of Armada. I don't know these crossings by name. The whistling posts tell us where these crossings are, and I blew it near the whistling post."

The fireman testified to the ringing of the bell, that it was started when they left Armada, and it was ringing when they stopped, and the lantern was still burning. As to the blowing of the whistles, this witness testified that they could be heard eight or ten miles, that he could not say how many times the engineer blew it between Armada and Romeo, but he thought he blew it every time he came to a crossing, but the witness would not state positively whether he blew it or not every time he passed a crossing between Armada and Romeo; that he had a recollection of the engineer blowing the whistle several times, but the witness was busy about his duties throwing on coal from time to time. The brakeman's testimony about the ringing of the bell was substantially the same as that of the fireman.

At the close of the testimony, counsel for defendant moved the court to direct a verdict for the defendant, for the reasons that no negligence of defendant had been shown, and that plaintiff was guilty of contributory negligence. This was refused and an exception taken, and

the case was submitted to the jury by the trial court. As stated by defendant's counsel in his brief, the negligence of which it is claimed defendant was guilty, and which question the trial judge submitted to the jury for their determination, is well set forth in the following language:

"You are further instructed under the evidence that if the engine in question sounded the crossing bell at a proper distance east of the crossing, that the bell on such engine was ringing as it approached the crossing, and that a white light in the shape of a lantern was upon the west end of the tender, then the defendant company was guilty of no negligence in the premises, and your verdict should then be for the defendant."

The jury returned a verdict for the plaintiff for $5,000. There is no claim that this verdict was excessive, if the plaintiff was entitled to recover. There was no motion for a new trial. The defendant has brought the case here upon bill of exceptions, and by assignments of error has presented the questions already mentioned.

(1) It is the claim of the defendant that the evidence fails to show that the defendant was guilty of any negligence, and that the trial judge should so have charged the jury as requested.

(2) That the plaintiff was guilty of contributory negligence as matter of law, and that the trial judge should, as requested, so have instructed the jury.

The plaintiff contends that the testimony fairly tends to show the following significant facts:

(1) That it was a dark night.

(2) That the train was running backwards without a headlight.

(3) That there was no lookout or watch ahead.

(4) That there was an excessive rate of speed.

(5) No warning whistle or bell.

The plaintiff contends that the testimony to establish these facts was positive in its nature, and not negative.

We have already indicated that the plaintiff and five of his witnesses testified that it was a dark night; some of them say a very dark night. This was disputed by an

equal number of witnesses on behalf of the defendant, and the weather men from Detroit and Grand Rapids. That the train was running backwards and without a headlight, except the hand lantern hung on the tender, and that there was no lookout or watch ahead, do not seem to be disputed. The proposition that the engine was running at an excessive rate of speed is disputed, the plaintiff having shown by two witnesses whose testimony is criticised by the defendant that the train was running from 40 to 50 miles an hour, while the engineer, fireman, and brakeman testified to the lesser rate of speed, which we have alluded to. The fifth proposition, as to the statutory whistle and bell, is disputed; the plaintiff and several of his witnesses testifying that no signals were given, or that they heard no signals while listening for them, while the defendant's witnesses in charge of the engine testify positively in regard to the ringing of the bell, but this cannot be said of the sounding of the whistle, for really the engineer in charge is the only person who testifies positively as to the sounding of the whistle, and he only spoke as to all crossings, not knowing this crossing from the others.

1. Upon the first point urged by defendant, it is strenuously insisted by counsel that the testimony which the plaintiff introduced, as to whether there was a light upon the tender at the time it approached the Hadley crossing, and as to whether the whistle was sounded at a proper distance, and the bell rung, was purely of a negative character, the witnesses being either in no position to observe signals or paying no heed whatever, and it is urged that the cases of *Stewart* v. *Railroad Co.*, 119 Mich. 91 (77 N. W. 643), *Britton* v. *Railroad Co.*, 122 Mich. 359 (81 N. W. 253), and *Bond* v. *Railway Co.*, 128 Mich. 577 (87 N. W. 755), are conclusive and controlling upon this point. We have examined these cases with considerable care, and are unable to agree with defendant's counsel in this contention. It should not be forgotten that in the instant case the injury occurred in the nighttime. The case of *Stewart* v. *Railroad Co.*, *supra*, arose from an injury

which occurred by daylight, and the headnote specifically points out the distinction between that case and this:

" In an action for the death of plaintiff's intestate in a collision at a railroad crossing, three of the train crew testified positively to the giving of the proper crossing signals, and were supported in this respect by two of plaintiff's witnesses. The only testimony relied upon by plaintiff as raising an issue for the jury was that of certain witnesses who testified that they did not hear the signals, but who admitted that they were occupied with other matters, and were not in positions favorable to hearing them, and the confused and uncertain testimony of a child 11 years old.  *Held*, that the jury should have been instructed that the signals were given."

In *Britton* v. *Railroad Co.*, *supra*, the headnote upon this branch of the case is as follows:

" The testimony of the occupants of a closed carriage, struck by a train at a railroad crossing, that, although they stopped two rods from the track, and listened, they heard no crossing signals, does not rise to the dignity of evidence, so as to take the question to the jury, where all the members of the train crew, and a bystander, an entirely disinterested witness, testify positively that the signals were given, and state the reasons for their recollection."

In *Bond* v. *Railway Co.*, *supra*, the headnote is as follows:

"Where, in an action for injuries caused by a collision at a railroad crossing, the negligence alleged was a failure to give the statutory signals, and there was the testimony of seven witnesses, including those in charge of the train, that the signals were given, as against the sole testimony of the plaintiff, a woman partially deaf, who, at the time of the accident, was sitting in a closed carriage, and whose testimony was in several respects contradictory of that given by her on a former trial, a motion to set aside a verdict in her favor, and grant a new trial, on the ground that the verdict was against the weight of the evidence, should have been granted."

It seems to us that these cases are readily distinguishable from the case we are considering, and that the ques-

tion of the negligence of the defendant was properly sub-
mitted to the jury.    In our opinion the case more clearly
resembles that of *Lonis* v. *Railway Co.*, 111 Mich. 458–
460 (69 N. W. 642, 643).    In that case Mr. Justice
Grant said:

"Five witnesses for the plaintiff swear positively that
the signals were not given, and give their reasons why
they so testified.    One other witness, John Williams,
testified that he was 'looking right at the engine,' and that
he did not hear any bell or whistle.    On cross-examination
he said 'he did not think he was thinking anything at all
about any train coming; that his attention was not called
directly as to whether the train whistled or whether it did
not, although, being out of doors, he would have heard it,
probably, if it had whistled; that he would hardly think
the bell would ring without he noticed it at such a time as
that,—in fact, he was talking about it right away.    On
the part of the defendant, 18 witnesses testified positively
that the signals were given.    We do not think there was
negative testimony to which the request would have been
applicable.    The only testimony to which that term could
possibly be applied was that of Williams.    But he said
that he was looking at the engine, was out of doors, and
within hearing distance.    It seems improbable, as he tes-
tified, that he would not have heard them under these cir-
cumstances.    The situation before the jury was one of
positive testimony against positive testimony, and their
verdict depended upon which they believed.    They have
said by their verdict that they believed the five witnesses
for plaintiff, and did not believe the 18 for the defendant.
If there was any remedy for the defendant, it lay with the
circuit judge, who saw the witnesses, and was better able
than we are to determine whether the jury disregarded the
rule as to preponderance of evidence, so as to justify him
in granting a new trial."

See, also, *Crane* v. *Railroad Co.*, 107 Mich. 511 (65 N.
W. 527); *Hinkley* v. *Railway Co.*, 162 Mich. 546 (127 N.
W. 668).

2. Upon the question of contributory negligence, de-
fendant's counsel says that—

"The case at bar differs from the usual crossing acci-
dent, in that there is no testimony as to the conduct of

plaintiff as he approached the crossing in question other than is given us by him. We are compelled, therefore, to accept as true, his version of what he did, but, should this show him to have been guilty of contributory negligence, then there was, under the decisions of this court, no question for the trial judge to submit to the jury."

And he cites, in support of his position, *Davis* v. *Railroad Co.*, 20 Mich. 105 (4 Am. Rep. 364); *Jenks* v. *Colwell*, 66 Mich. 420 (33 N. W. 528, 11 Am. St. Rep. 502); *Karrer* v. *Railway Co.*, 76 Mich. 400 (43 N. W. 370); *Brady* v. *Railroad Co.*, 81 Mich. 616 (45 N. W. 1110). These cases do not seem to us to be controlling of the question here. In *Davis* v. *Railroad Co.*, *supra*, this court held that when the plaintiff on the stand as a witness states his case so as to show that he has no cause of action, and there is no attempt at a qualifying explanation by other witnesses, he has no ground of complaint if the court charge the jury that no recovery is justifiable. In *Jenks* v. *Colwell*, *supra*, it was held that, where the undisputed testimony of the plaintiffs in the case establishes a fact affecting their right to recover, it is error to submit such fact to the jury, as a question in dispute under the testimony. In *Karrer* v. *Railway Co.*, *supra*, this court said:

"Where there is conflicting testimony, and a plaintiff's case is made out, unless disbelieved, it is proper to let the jury decide the controversy; but they should not be allowed to give a plaintiff a verdict against his own admissions and his own case as he makes it out, with no other reliance."

In *Brady* v. *Railroad Co.*, *supra*, this court ruled that a plaintiff is held to have been guilty of contributory negligence in attempting to cross a railroad track at a crossing so obstructed by intervening objects that he could not see a train approaching from one direction until he was within 20 or 25 feet of the crossing, and then only for a few rods up the track, without first stopping his team and taking some precaution to see if a train, which he knew was about due, was approaching.

We cannot agree with counsel that the above authorities are applicable in this case upon the question of contributory negligence. If the plaintiff's testimony is to be believed, he was guilty of no negligence. In our opinion whether he testified truthfully or not was a fair question for the jury. If it was a dark night, and if the wind was blowing as he claims it was at the time, if there was no light, and if no statutory signals were given, it is difficult to understand why the plaintiff had not the right to suppose it was safe for him to cross the railroad track, after he had stopped, and looked and listened, as testified to by him.

In our opinion the case was properly submitted to the jury upon the questions of fact involved, and, after examining the entire record with care, we are unable to discover any reversible error. The judgment of the circuit court is therefore affirmed.

MOORE, MCALVAY, BROOKE, and BLAIR, JJ., concurred.