FILLINGHAM *v.* DETROIT, GRAND HAVEN & MILWAUKEE
RAILWAY CO.

1. Railroads—Negligence—Speed of Train—Witnesses—Competency.

Witnesses who had sufficient opportunity to see a train
when it was running, and to observe where it stopped,
after striking an automobile on a highway crossing, *held*,
competent to testify as to its speed in an action for per-
sonal injuries alleging negligence of defendant for run-
ning at an excessive rate of speed.

2. Same—Negligence—Question for Jury.

Conflict in the testimony as to whether a box car on the
siding obstructed plaintiff's view of the approaching train,
as to the speed of the train, and as to whether the cross-
ing signals were given, *held*, to render them peculiarly
questions for the jury.

3. Same—New Trial—Weight of Evidence.

*Held*, that the verdict in favor of plaintiff was not against
the great weight of the evidence.

4. Same—Contributory Negligence—Crossing Accident.

Where plaintiff stopped, looked, and listened, but saw and
heard nothing, when about 50 or 60 feet from the track,
if the view of the main track was so obstructed by a box
car on the siding that after passing the obstruction there
was no safety zone in which to stop, look and listen, the
court below was not in error in not applying the rule re-
quiring the driver of an automobile to do so before pro-
ceeding to cross the track.

Steere, Brooke, and Fellows, JJ., dissenting.

Error to Oakland; Rockwell, J. Submitted June 11,
1919; reargued November 5, 1919. (Docket No. 42.)
Decided December 22, 1919.

Case by Charles Fillingham against the Detroit,
Grand Haven & Milwaukee Railway Company for per-

sonal injuries. Judgment for plaintiff. Defendant brings error. Affirmed.

*Harrison Geer* (*H. R. Martin,* of counsel), for appellant.

*Pelton & McGee,* for appellee.

MOORE, J. This suit is brought to recover for personal injuries received at the crossing of defendant's railroad and Saginaw street at Holly. From a judgment in favor of the plaintiff the case is brought here by writ of error.

Saginaw street runs north and south and the railroad northwest and southeast, the street intersecting the railroad at an angle of 60 degrees, 37 minutes. The automobile was being driven south. The train came from the west on the main line. Saginaw street is 85 feet wide on the north side of the railroad. There is a sidewalk north of the main track, crossing Saginaw street and running alongside Seeley's coal shed, which is west of the street. The distance between the north rail of the main track and the south side of the coal shed is 18 feet and a fraction. From the north rail of the main track to the south rail of the sidetrack is 8.3 feet. The sidetrack is 4 feet 8 inches wide. From the north rail of the sidetrack to the south side of the coal shed is 5.8 feet. Besides the coal shed and office there are two telegraph poles, one 12 and the other 8 inches in diameter, and a safety gate, on the west side of Saginaw street.

The plaintiff's version of what occurred is as follows:

"There was a coal office on my right side as I went south, as shown on this exhibit. There were freight cars there and a coal shed. My son drove the car from my home to Holly. It was around ten when we started to go home. My son backed, cranked up the car and got in, and I got in, and we backed off into

the street.  It is a left hand drive car.  I was sitting on the right hand side of him.  There was no one else in the car.  When we backed out into the street we stopped.  The car was headed towards the south then.  We looked and listened before going across the track, and then went ahead.  We started south towards the crossing and stopped and looked and listened, and I told my boy to go ahead, didn't hear any sign of any train or anything, and he drove the car in low, had the car in low and going very slowly and when we approached the track, the crash came and that is all I remember.  There were gates at that crossing, but they were up.  When we got up to the track there were freight cars to the right of us.  I know where the coal shed is.  With reference to the freight car, it was on the north side of the track, close to the sidewalk.  I have reference to this sidewalk that runs along the west side of Saginaw street.  There were cars on the east side, on the north track.  The first thing I remember after I was struck I was in Mr. Clyde Hadley's house, a gentleman living there in Holly.  They had started to take me to the doctor, but he was sick so they carried me over to Mr. Hadley's."

On the cross-examination he testified:

"My son had to crank the automobile and as soon as that was done we got right into the car and backed out into the street to the middle of it.  As soon as we had backed out a sufficient distance, we turned the car and headed to the south.  *  *  *  I didn't discover this engine which collided with my car before it did collide.  I saw no headlight and didn't hear the car coming down from the west.  I was very familiar with that crossing and had been for a good many years.  I know that trains coming from the west have to cross over Saginaw street in order to get to the depot.  I didn't hear or see anything until I was struck by the engine.  My car was nearly across the track. I know something struck my car in the rear.  My car was thrown to the south and was struck right over the right rear wheel.  If I had been a few feet further south the car would not have been touched.  I don't remember when I was picked up; I was not conscious, didn't know anything for a long time."

On the redirect-examination he testified:

"I said we were about fifty or sixty feet from the track when my son stopped the car and we listened and then proceeded toward the crossing, going south. As we approached the north side of the track my son was driving the car in low. I sat right side of him and was listening and watching to see if there was a train anywhere near. I heard and saw none. There was nothing to have prevented me from hearing the whistle if it had been given."

The son's version is as follows:

"I got in the car first and started it, and then my father got in. Then I backed out into the street. I recall the sewer grate there; my car was parked south ·of that, towards the crossing. Then after I had backed out, we headed south. We stopped, looked each way, and listened, and proceeded very slowly and cautiously toward the tracks. I was driving the car and was on the left hand side of the seat. My father was on the right side. The top was up, but there were no side curtains on. From that point on we proceeded very cautiously towards the tracks, by running very slowly, and as we approached very near the tracks we nearly came to a complete stop, not quite, and still were looking in both directions, and then we went on and were struck. When we got up to the track, I observed a box car south and east of the coal sheds, on the north sidetrack, I believe. That obstructed the view to the west. From the front seat of a Ford car to the end of the radiator it is about six feet, I believe. We didn't hear any bell ringing; we were listening all the time. We heard no signal, no whistle. The first knowledge I had of the train was when a bright light seemed to appear and the next second it hit us. After we were struck the first thing I realized was that I was on the ground there, trying to get up. I was somewhere south and east of that crossing. How far, I don't know. It would be south of the gates, on the east side. Afterwards, when I saw the automobile, it was near the sidewalk somewhere by the gates. I should think it was probably sixty feet or so. I did not see my father just then, but did before he was taken to Mr. Hadley's. He was somewhere in the

garden, and some men were picking him up.  I went along with him over to Mr. Hadley's.  *  *  *  Dr. Keller looked after him.

"I saw the car after the accident.  It was struck over the right hand wheels, towards the rear end. From the time I started to crank my car and start it home, I did not hear any signal from a train, whistle, bell, or anything else.  There was nothing I know of to prevent my hearing it.  As we proceeded south down Saginaw street, I think we were about in the middle of the highway."

On the cross-examination he testified:

"The south end of my car at the time I started to go south across the track was about 45 or 50 feet north of the track.

"*Q.* And at that time and before you started, did. you see this box car standing there at your right?

"*A.* No, sir.

"*Q.* How near the track did you get when you discovered that box car standing at your right? ·

"*A.* Pretty close to the track.

"*Q.* Is that right, the east end of the box car would be east of the east side of Seeley's coal shed?

"*A.* I believe it was.  I didn't take any particular notice to see how far the box car projected east of the coal shed.  I saw the box car; I knew it was there when I was about ready to cross the tracks.  We drove up very slowly for about forty feet.  My engine was running all the time after I cranked it up, up to the time of the collision.  It made some noise.  As we came up there just north of the box car, we went along very slowly, came almost to a stop.  When we got by the box car we looked to the west.

"*Q.* When you got by the box car the box car hid the view, the bright light of the train was there; did you know that the box car would hide your view from an approaching train?

"*A.* I didn't notice it at the time.  We were just about on the sidetrack when I discovered the box car standing there west of Saginaw street.  The east end of the box car was perhaps thirty feet or so west from us.  It was just as we came up there, right on the track, that we discovered that flashlight from the head of the engine.

"*Q.* Well, how long do you think you had discovered that flashlight from the headlight of the engine before you attempted to cross over?

"*A.* Probably instantaneous.  *  *  *  I think that you can look west and see a train approaching from the west if there is nothing on the sidetracks, at least a mile and a half.  On this occasion there were the coal sheds and box car to hide my view.  You couldn't look west for at least a mile and a half across that bend when you were on the south side of the coal sheds, if no box cars were standing there, unless you were in the middle of the track.  Within eighteen feet of this track you cannot look west if there isn't anything on the tracks, and see for at least a mile and a half. I have made tests several times recently.  You would have to be within six or seven feet of the track before you could look west a mile and a half, that is, if there were no box car there.  That would be either on foot or in the automobile.  I did not observe this box car until we came up there on the track; did not observe it before.

"*Q.* Well, how near did you get to it when you first discovered that it was there on west of Saginaw street?

"*A.* Probably within eight or ten feet.

"*Q.* Then, during the last ten feet, when you were driving, before you got to the box car, you knew it was there and that it would cut off your view from seeing a train approaching from the west, didn't you?

"*A.* I knew it was there but I did not observe that it would cut off the view at the time.  I didn't think anything about the view at that time.  I think I was between the sidetrack and perhaps the front end of the machine was on the main track when I discovered the light.  I didn't remember anything further about the light, it came so suddenly, the next thing was the collision.  I didn't have time to try to go faster after I discovered the headlight of the engine.  I was going at a slow speed at the time, and had not changed it up to the time of the accident.  I understood the use of the brake.  It depends on how hard you put on your brake how quickly you can stop a Ford going five or six miles an hour.  You can stop it within two or three feet.  My car was going at about three or four miles an hour, so that at any time I think I could have stopped it within three feet."

On the redirect-examination he testified:

"My best judgment is that the automobile was on the main track when I saw the light. There was a very short time between when I saw the light and when I was struck; it was practically instantaneous. To put the car into reverse you have to release, if you are driving slow, and put it into neutral and press on the reverse. You would, in driving in low speed have to stop and release your clutch and then back up. I did not have time to take those steps when I discovered that train."

Several witnesses testified the train was running 25 or 30 miles an hour and that they heard neither whistle nor bell though they were listening at the time.

It was the claim of the defendant that the train was running but 15 miles an hour, that a crossing whistle had been blown at the proper place, that the bell was rung continuously, and that there was no car on the siding to obstruct the view to the west.

It is the claim of the appellant:

"1. The defendant was not guilty of any negligence.
"2. The plaintiff was guilty of contributory negligence.
"3. The verdict of the jury was contrary to the great weight of the evidence.
"4. There was error in the refusal to give certain instructions and in the charge as given."

We quote from the brief:

"The only charges of negligence in this case as to which there may be room for argument is with respect to the speed of the train, and whether signals, by whistle and bell, were properly given. It is our contention that there is no testimony which rises to the dignity of evidence that the defendant was negligent in these particulars. *   *   *
"This court in a number of cases has had occasion to consider the question of the qualification of a witness to testify as to speed, but in this case we raise

no question respecting the qualification of these witnesses. Our point is with respect to their opportunity for observation."

Counsel cite *Mott* v. *Railway Co.*, 120 Mich. 127; *Canerdy* v. *Railway Co.*, 156 Mich. 211, and other cases. In both of these cases the court held the questions of negligence of defendant and the contributory negligence of the plaintiff were for the jury. In the instant case the witnesses had sufficient opportunity to see the train when it was running and to observe where it stopped, to make it competent for them to testify. *Detroit, etc., R. Co.* v. *Van Steinburg*, 17 Mich. 104; *Thomas* v. *Railway Co.*, 86 Mich. 496; *Line* v. *Railway Co.*, 143 Mich. 163, and cases cited therein; *Garran* v. *Railroad Co.*, 144 Mich. 26. We again quote from the brief:

"*Second.* As to the signals, by whistle and bell, given for the purpose of warning.

"On this point the testimony is apparently conflicting, but when it is examined it will be found that the testimony relied upon to show that the signals were not given is negative in character, while that to the effect that the signals were given is of a positive nature. In cases where testimony claimed to show failure to give signals is of a negative character, this court has held that such testimony is to be wholly disregarded as against the positive testimony that they were given. *Stewart* v. *Railroad Co.*, 119 Mich. 91; *Britton* v. *Railroad Co.*, 122 Mich. 359; *Bond* v. *Railway Co.*, 128 Mich. 577."

A number of witnesses testified that they were observing the train and listening for the signals for reasons which they gave in detail, and that they saw and heard no signals for this crossing. We think this made a question for the jury. *Cotton* v. *Railway Co.*, 99 Minn. 366 (109 N. W. 835, 8 L. R. A. [N. S.] 643, 9 Ann. Cas. 935); *Crane* v. *Railroad Co.*, 107 Mich. 511; *Lonis* v. *Railway Co.*, 111 Mich. 458; *Hinkley* v.

*Railway Co.*, 162 Mich. 546; *Tietz* v. *Railway*, 166 Mich. 205; *Nichols* v. *Railway Co.*, 203 Mich. 372.

We again quote from the brief:

"If there was any evidence to take the case to the jury on the question of negligence and contributory negligence—and we strenuously insist there was not —then we must urgently contend that the verdict is contrary to the great weight of the evidence. In arguing the questions of negligence and contributory negligence before the question of the weight of the evidence we do not wish to be understood as indicating in the slightest degree that we regard the strength of our position on the latter question as less than on the former. On the record in this case, if there was an assignment of error only with respect to the weight of the evidence, we should feel confident that the verdict must be reversed." Citing *In re McIntyre's Estate*, 160 Mich. 117, 120, 121; *Brown* v. *Railroad Co.*, 183 Mich. 574, 585, 586; *Barger* v. *Bissell*, 188 Mich. 366; 204 Mich. 416; *Malloy* v. *Railway Co.*, 192 Mich. 344, 352; *Miller* v. *Railway*, 200 Mich. 388.

It must be conceded the testimony is conflicting. As to the car on the siding, nine witnesses, including the plaintiff and his son, testified to the presence of this car west of the sidewalk. On the contrary, defendant produced the baggageman at Holly who testified from the record kept by him that there was no car on this siding at the time of the accident, that the last car which had stood there prior to the accident was taken away three days before. Defendant also produced the conductor of the train which took away, three days before the accident, the car which had stood on this siding. Mr. Seeley, the owner of the coal sheds, testified that there was no car on this siding up to six o'clock on the evening of the accident, and none there Monday morning. Other witnesses testified that there was no box car there. Someone was mistaken or guilty of falsifying. This conflict in the testimony as to the car on the siding, as to the speed of the train, and whether the signals were given, made them peculiarly questions for the jury.

We again quote from the brief:

"Defendant's requests to charge, numbers 3 and 5, cover the point that an automobile driver is held to the same degree of care as a pedestrian; instead of that applying to the driver of an animal-drawn vehicle. This is the doctrine laid down in *Colborne* v. *Railway*, 177 Mich. 139, 149, cited and quoted approvingly in *Sanford* v. *Railway Co.*, 190 Mich. 390, 399. In the former case, STEERE, C. J., said, respecting the duty to look and stop if necessary, just before entering upon the track:

"'This rule should be as strictly applied to an automobile as to a pedestrian.'

"The trial judge did not cover this point in his general charge, and hence the 7th and 8th assignments of error should be sustained."

If the isolated sentence counsel quote is read in connection with what precedes and follows it will be apparent that the opinion did not justify the giving of the requests which were preferred.

In the instant case plaintiff claimed, and his witnesses testified, that before he entered upon a field where his vision was obstructed he stopped, looked and listened and saw and heard nothing indicating an approaching train; that he proceeded cautiously. It is his further claim that the coal office, the coal sheds and the box car made it impossible to see an approaching train while he was still in the safety zone. The distance from the main track to the siding was less than nine feet, the overhang of the box car was a foot and a half and the overhang of the locomotive was more. From the driver's seat to the front of the automobile was six feet, so that it is apparent that after passing the box car, if one was there, the occupants of the automobile did not have any safety zone in which to stop, look and listen. The testimony was conflicting as to whether there was a box car on the siding, as to the speed of the train, and the giving of

the signals. The testimony offered on behalf of the plaintiffs, if believed, made a case for the jury. On the other hand, if the witnesses offered by the defendant were believed, they made a complete defense. The case was carefully tried by able counsel and was submitted properly to the jury. We find no reversible error.

Judgment is affirmed, with costs to the plaintiff.

BIRD, C. J., and SHARPE, STONE, and KUHN, JJ., concurred with MOORE, J.

BROOKE, J. (*dissenting*). The distance between the sidetrack and the main track was 8.3 feet. The box car standing on the main track, as claimed by plaintiff, was nearly 60 feet distant, so that as plaintiff approached the main track, his view to the west was constantly widening. The evidence to the effect that no box car stood there as claimed by the plaintiff, including as it does the written records of the movement of the car in question, kept by defendant in the regular course of business, is very persuasive.

The weight of the evidence upon the question of the sounding of the statutory signals is upon the side of defendant. Plaintiff's automobile, according to his own testimony, was being propelled at a very low rate of speed and could have been stopped within three feet. A strong headlight was burning upon the engine with which he collided, projecting its rays from 800 to 1,000 feet ahead. Under the facts as disclosed by this record plaintiff was clearly guilty of contributory negligence under the authority of the following cases: *Colborne* v. *Railway*, 177 Mich. 139; *Sanford* v. *Railway Co.*, 190 Mich. 390; *Gillett* v. *Traction Co.*, 205 Mich. 410.

The judgment should be reversed and a new trial ordered.

STEERE and FELLOWS, JJ., concurred with BROOKE, J.