SCHWARTZ *v.* MINERAL RANGE RAILROAD CO.

1. RAILROADS — INJURIES AT CROSSINGS — CONTRIBUTORY NEGLI-
GENCE—PRESUMPTIONS.

The presumption that one killed at a railway crossing, in the
absence of testimony as to his conduct, did not fail to take
proper precautions before attempting to cross the track, can-
not be indulged to support a verdict against the railroad com-
pany in a case where it appears that shortly before reaching
the crossing deceased stopped his team and took a position on
the side of his load from which a train, according to the
schedule, might be expected, but on the opposite side from
that which the train in fact came, and went from thence to
the crossing without stopping.

2. SAME—CONTRIBUTORY NEGLIGENCE.

Where trains from the east and from the west were due to
pass a crossing at shortly before 1:35 and shortly after 1:55,
p. m., respectively, the fact that it was after 1:55 when de-
ceased approached the crossing did not justify him, consider-
ing the season of the year and the locality, in withdrawing
his attention entirely from the east.

Error to Ontonagon; Cooper, J. Submitted April 14,
1908. (Docket No. 5.) Decided May 26, 1908.

Case by Kate Schwartz, administratrix of the estate of
John Fravert, deceased, against the Mineral Range Rail-
road Company for the negligent killing of plaintiff's intes-
tate. There was judgment for plaintiff, and defendant
brings error. Reversed.

*A. B. Eldredge* and *A. E. Miller*, for appellant.

*P. H. O'Brien*, for appellee.

BLAIR, J. This is an action for the negligent killing
of one John Fravert on the 3d of February, 1904. The
accident occurred on the Chicago, Milwaukee & St. Paul
Railway, where the same crosses a public highway known

as the Rockland road, running from Ontonagon to Rockland. This highway, at the point in question, crosses the railway at an angle of about 65 degrees, the railway running northwesterly and southeasterly; the highway at the point of crossing running almost due north and south. The crossing is about one mile east of the village of Ontonagon, and almost immediately west the railway begins to curve, and descends a sharp grade into the village of Ontonagon. One thousand one hundred and forty feet east of the center of the crossing is a whistling post, and at this whistling post the railway has commenced to curve quite sharply to the southeast. On the east side of the highway, 197 feet from the railway track, is a barn. On the southerly side of the railway, 56 feet south of the south rail and extending 1,080 feet from the crossing easterly, was a high, board, snow fence, 7 feet 6 inches in height, with an average space between the boards of about $2\frac{1}{2}$ inches, the widest spaces being $5\frac{1}{2}$ inches. Some of the spaces were only an inch.

The highway sloped down to the railway track, and, at a point 96 feet south, was, in its natural condition, $3\frac{1}{2}$ feet higher than at the crossing.

At the time in question there was snow upon the ground, to a depth of two or three feet in the traveled part of the highway. The snow thrown out by the snow plows of the railroad company into the highway at and near the crossing had been thrown up on each side of the highway for a distance of 15 to 20 feet back from the crossing. Its height was in dispute; the witnesses for the plaintiff claiming that it was 6 or 7 feet high, the defendant's witnesses, that it was from 4 to 5 feet.

By reason of the removal of the snow from the railroad track, the inclined 96 feet above referred to had, at the time of the accident, been shortened up so that for the last 30 feet it was quite sharp; and the witnesses are all agreed that a loaded team which started down this incline could not be stopped until it had reached the track.

The track east of the crossing is in a cut, the south

bank of which is about 6 feet above the track at the crossing and gradually decreases in height to the east end of the snow fence which stands upon it.

"It is on a bank about 3 feet above the highway and about 6 feet above the level of the railway track."

Defendant's train, which struck and killed plaintiff's intestate, was due in Ontonagon at 1 :35 p. m. and due to leave on its return trip east at 1 :55 p. m.   The accident occurred at about 2 :05 p. m.

The only witness of the accident testified as follows :

"I saw John Fravert that day about a mile on the other side of the crossing, or a mile and a half, on the Rockland side of the crossing.   I was coming to Ontonagon with a load of hay.   John Fravert was hauling wood to Ontonagon with a double team of horses.   He had a big load of cordwood.   I was behind him.   I drove right up pretty close to him, 5 or 6 feet may be, the team was behind.   We stopped once at the barn up there by the crossing; I mean the barn that is near the railroad crossing; it is on the right-hand side as we were going along. We stopped on the railway side of the barn.

"*Q.* What did John Fravert do, if anything, after you stopped there?

"*A.* He changed over onto the left-hand side of the load, and started up, went down to the crossing.   Just as he got on the crossing the train came along and struck him.   The train ran into the load and dragged him down the track, and threw the sleigh off the railroad.

"*Q.* Now, state whether you were listening for a train as you were approaching that crossing ?

"*A.* Yes, I was listening for a train.   I did not hear any whistle blown or bell rung.   I was about 15 or 20 feet from the crossing when the train went by.   The snow was piled up pretty high from the barn to the crossing on both sides.   *   *   *

"*Q.* Now, how was the snow with reference to that fence, how high was it ?

"*A.* Well, it was piled up pretty high; I think it was up to the top of the fence all right, if it wasn't over. Coming from the barn along the highway, towards the railway, I couldn't see a train until it got to the crossing, then I seen it pretty near to the crossing.

"*Q.* Why couldn't you see the train ?

"*A*. Well, there was too much snow piled up there. * * * It was a pretty cold day, and he was well bundled up. I didn't notice whether he had his cap down over his ears or not. It was a very cold day. He stopped at the barn two or three minutes anyway, stopped to rest his horses, and then he changed to the other side of the track, of the sleigh, that is nearest on—that is towards the west; the left-hand side, so that the way the train came, the wood was between him and the train.

" *Q*. And then he went down to the crossing from that spot without stopping at all ?

"*A*. Yes.

" *Q*. The team walking ?

"*A*. Yes.

" *Q*. Now, when you say that on account of the snow a man couldn't see from the barn across that fence, you mean a man walking in the highway ?

"*A*. Yes.

" *Q*. You could have seen from the top of that load of hay if you had looked ?

"*A*. Yes, I guess I could. * * * From the top of the load of hay I seen the train when it was about 20 or 25 feet from where the wagon road crosses—I guess 20 feet; and then the train was coming towards the crossing, about 20 feet from the crossing. * * * At the time that Fravert stopped there I didn't know what he stopped for; he didn't say what he stopped for.

" *Q*. Now, did you know whether he stopped to rest his horses or not ?

"*A*. No, I did not. I had my cap pulled down, but I guess I could hear all right if there was anything to hear. * * *

" *Q*. Mr. Snyder, do you remember whether you looked toward the east that day ?

"*A*. I looked both ways.

" *Q*. Did the bell ring or did it not ?

"*A*. No, the bell did not ring.

" *Q*. Did the whistle blow as the train approached from the east ?

"*A*. No, the whistle didn't blow; I didn't hear it blow.

" *Q*. Mr. Snyder, you weren't paying any attention to the whistle or bell were you ?

"*A*. If the whistle blew, I was right there; I would have heard it.

" *Q*. You weren't paying any attention to it, were you, up where you could see ?

"*A.* Well, I couldn't see much that day; it was pretty stormy.

" *Q.* You weren't paying any attention, were you?

"*A.* O, yes; I was paying a little; I was kind of expecting the train to come along.

"; *Q.* You weren't paying any particular attention as to whether that bell rang or the whistle blew, were you?

"*A.* I was right there; if it blew I would have heard it."

It was a stormy day and the snow was drifting with the wind, although it was not actually snowing.

The fireman testified:

"I stopped cleaning the window as soon as I saw the load of wood; I think we were about 200 feet from the crossing then. We had been going through a snowbank and the plow had been throwing snow back against the window, so that it was impossible to see ahead if you did not keep the snow off."

The engineer testified:

"It was not snowing any. Of course, it was windy, and the wind was drifting the snow, so that I was not able to see the crossing ahead until I got a clear rail. A bank of snow extended up to within 200 feet of the crossing, and the only time I had a view of the crossing would be from a point 200 feet from it. * * * My engine carried a plow. * * * My usual speed over that crossing is from 15 to 18 miles or 20 miles—say 15 miles an hour; and the reason why I was running at a greater speed than fifteen miles an hour was to get through those snowbanks. * * * The snow was drifting quite bad, and my view was pretty badly obscured going through the bank, until we were within 200 feet of the crossing, and we passed that two hundred feet in a few seconds."

Defendant's station agent testified:

"I know it was a bad day, snowing or blowing; you can't tell whether it snows or blows in this country; it left the atmosphere kind of snowy."

The testimony was in dispute as to whether a man walking north in the highway from the barn could see a train approaching from the east all the way until he reached the line of the snow fence; the plaintiff's testimony indi-

cating that from the snow fence to the track a view could not be had until too late to be of service, but that between the snow fence and barn there were places where a train could be seen and places where it could not be seen. As stated in plaintiff's brief:

"A person's ability to see a train approaching that crossing would depend upon his being in a particular spot at the time the train was approaching."

It was stipulated that there is a curve east of the crossing on the railway, at a distance of 1,080 feet from the crossing, and beyond this curve it is impossible to see the train from the highway.

A witness testified that he measured the height of the engine and coaches, and the engine was 12 feet 6 inches from the top of the smokestack to the track. The coaches measured 13 feet 6 inches from the rail to the top of the coach.

At the close of the testimony, defendant's counsel moved for a view of the premises by the jury, whereupon the following occurred:

"*Mr. O'Brien:* I think that we would be willing to have the jury view the premises, but on account of the conditions being dissimilar now as to what they were on that day, as far as snow is concerned, winter time then, summer time now, we object to the train running back and forth.

"*Mr. Eldredge:* The view would not be of any use unless the court will allow the jury to see the train running back and forth.

"*The Court:* I shall allow the jury to proceed to view the premises.  *  *  *

"The court thereupon took a recess for the purpose of having the jury view the premises, and after a view of the premises, and of the train going back and forth, the jury returned to the court-room, and the following proceedings were had:

"*Mr. Eldredge:* We have measured and agreed upon the heights of these two cars that were with us, and the engine, and they are, respectively: the coaches thirteen feet, six and a half inches; that was the passenger coach; and fourteen feet the baggage car and smoker combined,

and the engine fourteen feet, six. That being the height above the rail of each of them. That would make the baggage car six inches higher than the Mineral Range car, and the engine higher, but I can't recall how much."

At the close of plaintiff's testimony and at the close of the case, defendant's counsel moved for a verdict in its favor on the ground that under the undisputed evidence the plaintiff was guilty of contributory negligence. The same point was made by several requests to charge.

The trial judge charged the jury, among other things, as follows:

"If you find from the testimony that if he looked he could have seen said train in time to avoid his injuries, and you further find from the testimony that he failed to look, then in that case it will be your duty to say that he is guilty of contributory negligence, which will defeat his recovery in this case. On the other hand, if you find from said circumstances which I have outlined to you, and all the other circumstances in the case, that he did look, but by reason of the nature of the crossing and the conditions thereabout he was unable to see the train, and that he took such measures to avoid injuries as a reasonably prudent man occupying his situation under the same circumstances would have taken, then the said John Fravert cannot be said to be guilty of contributory negligence. * * *

"Every person is bound to know that a railroad crossing is a dangerous place, and he is guilty of negligence unless he approaches it as if it were dangerous. Fravert knew that the crossing where the accident complained of occurred was a dangerous one. He was bound to know that a train might be approaching, and if he did not look or listen to ascertain whether one was coming, at every place where he could look or listen, but on the contrary drove directly down from the barn on the south side of the crossing to the track, and that he did so without ascertaining, or using any effort whatever to ascertain whether a train was coming from either direction or both directions, then I charge you, gentlemen of the jury, that John Fravert would be guilty of contributory negligence. In other words, the fact that the train was late did not excuse Fravert from using diligence in ascertaining whether a train was coming from either or both directions upon

the day in question.   It was his duty to use care and precaution in approaching this crossing—such care and precaution as a prudent man would use, and that care and precaution imposed upon him the duty to observe and look and listen continually until he reached that crossing, to ascertain if possible whether a train was approaching either from Ontonagon or from the other direction."

Under this charge and their own view, the jury must have determined that Fravert looked and listened "at every place where he could look and listen," but by reason of the nature of the crossing and the conditions thereabout he was unable to see the train.

There was no evidence whatever that decedent looked or listened at any point, and the finding of the jury can only be sustained upon the ground that, in the absence of any testimony as to decedent's conduct in approaching the crossing, the jury would be justified in finding that he took proper precautions to ascertain whether a train was approaching.   *Mynning* v. *Railroad Co.*, 64 Mich. 93; *Underhill* v. *Railway Co.*, 81 Mich. 43; *Schremms* v. *Railroad Co.*, 145 Mich. 190.

But in the case before us there was testimony as to decedent's conduct, showing that after leaving the barn he placed himself on the west side of his large load of cordwood, "so that the way the train came the wood was between him and the train," and then went down to the crossing without stopping at all.   There is no room for a presumption or inference that he stopped, that he went, at any point, to the east side of his load, or that he looked towards the east at all.

All the circumstances required great care.   The snow was being drifted and whirled through the air by the high wind and tended, with the snow fence, to obscure the view of a train approaching from the east; the wind was blowing strongly away from the drivers and towards the oncoming train, making it more difficult to hear; midway between the snow fence and the track a steep descent began, during which the team could not be stopped.   With-

out pausing for even a second, at the top of the descent or anywhere else, to exercise his senses to the best purpose, either of sight or hearing; without, apparently, taking any precaution whatever against a train from the east, he drove upon the track.

The testimony shows that he knew the time of the trains, that the train which struck him was about due from the west, which adequately explains why he left the east side of his load at the barn and walked upon the west side, where he could see the train if it came from the expected direction. There was no evidence that he was relying upon Snyder to look to the east and warn him, and his conduct was negligent, unless the circumstance that if the train was on time it would be coming from the west excused him from giving any attention whatever to the eastern approach. Considering the short interval between the scheduled arrival and departure of this train, the season of the year and the locality, decedent was not justified in withdrawing his attention entirely from the east after leaving the barn. *Tucker* v. *Railway Co.*, 122 Mich. 149.

We are of the opinion that the defendant's motion for an instructed verdict should have been granted.

Judgment reversed, and new trial granted.

Montgomery, Ostrander, Hooker, and Carpenter, JJ., concurred.