CINADAR *v.* DETROIT, GRAND HAVEN & MILWAUKEE RAILWAY CO.

1. RAILROADS—NEGLIGENCE—CROSSING ACCIDENTS.

Where a young man, familiar with a railroad crossing and in possession of all faculties, and knowing that a fast passenger train was about due, was struck and killed by the engine, and there was testimony of various eyewitnesses who did not see the plaintiff until his vehicle was directly upon the track, and where the plaintiff relied in making his case upon the presumption that decedent was in the exercise of due care, the evidence also showing that his view was almost wholly obstructed until his horse was on the tracks, it could not be held as a matter of law that the deceased did not exercise an ordinary degree of care, and the trial court did not err in submitting the issue to the jury.

2. SAME—EVIDENCE—NEGLIGENCE.

*Held*, also, in passing on the question of negligence in giving the crossing signals, that the testimony of several witnesses, though negative in character, that from a position in which they might have heard they did not hear the signals given, was sufficient to carry the question to the jury.

Error to Oakland; Smith, J.   Submitted June 19, 1916.   (Docket No. 34.)   Decided September 26, 1916.

Case by Grace Cinadar, administratrix of the estate of Charles Cinadar, deceased, against the Detroit, Grand Haven & Milwaukee Railway Company for the negligent killing of plaintiff's intestate.   Judgment for plaintiff.   Defendant brings error.   Affirmed.

*Harrison Geer* (*W. K. Williams*, of counsel), for appellant.

*W. T. Hosner* (*Pelton & McGee*, of counsel), for appellee.

Stone, C. J.   The plaintiff, who was duly appointed administratrix of the estate of her deceased husband, Charles Cinadar, brings this suit against the railway company to recover damages for his instantaneous death, which occurred at the intersection of Sixth street and defendant's railroad in the village of Royal Oak, Oakland county, on September 22, 1913, at 5:15 p. m., while decedent was driving a single horse hitched to a wagon loaded with coal, in a westerly direction over defendant's crossing, through being struck by defendant's north-bound passenger train No. 21.   Defendant's depot, which was a freight and passenger depot combined, was located just beyond the northerly line of Fourth street, and on the easterly side of the main line.   Fifth street is a block south of Fourth street, and a block farther south is Sixth street, another block south is Seventh street, and a block still farther south is Eighth street.   All of these numbered streets run east and west.   They are crossed at right angles by Main street, which is the principal thoroughfare in the village, and is substantially 91 feet in width, and extends due north and south.

Defendant's railroad runs 15 degrees west of north

while passing through Royal Oak. Main street crosses the railroad near the intersection of Main and Seventh streets. The distance from the center of Main street at its intersection of Sixth street west to the center of defendant's main line track is 115 feet. It is a considerably greater distance from the intersection of Main and Fifth streets to the center of the track, and that distance increases as you go north.

Defendant's is a single main track railroad, so called. At the time of the accident there were three tracks crossing Fifth street, the easterly and westerly being sidings, and the center one the main line. Decedent was employed as a teamster by the Millen-Wright Company, lumber and coal dealers at Royal Oak. Their office and sheds faced Fifth street on the south side thereof, and were east of the three tracks of the defendant. A hardware store was located in the northeast portion of the main building. Edward Joyce, foreman for Millen-Wright Company, had his office in a portion of this store. Their buildings and sheds extended north and south the entire distance between Fifth and Sixth streets. Main street ran along the east side of their buildings. Five tracks of defendant crossed Sixth street, namely, the three tracks above mentioned as crossing Fifth street, a track which was most easterly leading from the east siding within the triangle formed by Sixth and Main streets and extending into the sheds of the Millen-Wright Company. This was a stub track, and used for the purpose of serving that industry. The fifth track was the most westerly crossing Sixth street, and was also a stub track, and was used as a team track. The condition as to the number of tracks at the Main street crossing near Seventh street, was the same as at Fifth street. The distance from the east side of the Millen-Wright Company building at Sixth street to the main track of defendant, was 69½ feet. The distance

from the crosswalk over Sixth street at the west side of Main street to east rail of the Millen-Wright Company track—the most easterly track on Sixth street— was 38 feet. It was 17½ feet from the center of this track to the center of the siding next west, and 14½ feet from the center of this siding to the center of the main line. It was therefore 32 feet from the center of the easterly siding to the center of the main line.

A driveway 20 feet wide led north from Sixth street into the Millen-Wright Company sheds. It was near the easterly siding. The distance from the south line of Sixth street to the north line of Seventh street was 245 feet, and the distance from the center of the main line crossing at Sixth street to the center of the railroad crossing at Main street was 239 feet. There was no flagman, gates, or bell at the Sixth street crossing, and never had been so far as the record discloses, but there was a flagman at the Main street crossing near Seventh street. Lawson's lumber and coal yard was situated east of Main street and at the north side of Seventh street. The Millen-Wright Company siding would hold one box car between the south crosswalk at Sixth street, and the west crosswalk on Main street. At the time in question a box car stood between Sixth and Main streets, the northerly portion of which car was upon the Millen-Wright Company siding, and the southerly portion of the car was upon the east siding proper. Another box car stood east of the Main street sidewalk opposite Lawson's coal shed. These cars would, in a measure, obstruct the view of a person driving south on Main street, or west on Sixth street, of a train approaching upon defendant's main line track from the south.

Train No. 21, a regular train, was scheduled to pass through the village of Royal Oak without stopping at 5:14 p. m. As we have stated, the accident occurred at 5:15 p. m. It was still daylight. Many persons in

the village were familiar with the fact that this train passed through every afternoon about 5:15 p. m. without stopping. The decedent had, for upwards of a year and a half before his death lived near the village of Big Beaver, which was northeast of Royal Oak. He was 26 years of age, and left surviving him the plaintiff, who was 25 years old, and their infant son, 19 months old. He went to work for the Millen-Wright Company about 4½ months before the day in question. He was first employed at work about their yard in unloading cars and loading wagons. Later he was given steady employment as one of their teamsters. His pay was $15 per week. After he was employed as a teamster his work required him to deliver coal, lumber, etc., to the customers of this company about the village of Royal Oak. The said employers kept their horses in a barn located west of defendant's tracks, and it was therefore necessary that the decedent cross these tracks several times daily. It was also necessary for him to cross the tracks whenever he made a delivery west of Main street. Decedent had passed over the various crossings of defendant, among them the Sixth street crossing, many times. He had, at the time in question, loaded his wagon with coal taken from a car standing near Fifth street on the siding east of the main line. Having completed his load, he drove north to Fifth street, turned east upon that street, and proceeded to Main street, where he turned south, and drove to the scales located just east of the west sidewalk at Main street, and between Fifth and Sixth streets. Foreman Joyce weighed the coal for decedent. The latter then proceeded south down Main street as far as Sixth street, where he turned west. As he drove south from the scales the car near Lawson's coal shed, and just east of the easterly walk along Main street, was in plain view, and when he arrived near the intersection of Main and Sixth streets,

the car which stood just south of the south walk on Sixth street was also in plain view. The train was running about 30 miles an hour when it struck and killed decedent. The railroad track was straight from the depot southerly for some distance beyond Eighth street.

Defendant moved the court at the close of plaintiff's evidence for a directed verdict, for the reasons: *First,* that plaintiff had failed to show negligence upon the part of the defendant; and, *second,* that decedent was, as matter of law, guilty of contributory negligence. The motion was denied by the court, and defendant's counsel duly excepted. The motion was renewed at the close of all the evidence, for the same reasons, and was again denied, and exception taken. The trial court submitted to the jury the one question of fact as to the negligence of defendant, viz., whether a crossing signal had been sounded. It further submitted to the jury the question whether or not decedent had been guilty of contributory negligence in the premises. The jury returned a verdict for the plaintiff for $4,084.87, and judgment was entered accordingly.

The defendant has brought the case here for review, and by appropriate assignments of error it is claimed:

(1) That the decedent was guilty of contributory negligence as a matter of law, and the trial court should so have instructed the jury.
(2) That defendant was not guilty of any negligence in the premises, and the trial court should have thus instructed the jury.

1. Was decedent shown to have been guilty of contributory negligence as matter of law? It is urged by appellant that decedent, a young man in the possession of all his faculties, familiar with his surroundings, knowing that his view was in a measure obstructed, and that a regular scheduled fast passenger train was due, was bound to stop his horse and listen to ascer-

tain whether a train was in close proximity to that crossing. It is said that, had he stopped his horse, he could have heard the noise of the approaching train and avoided this accident. Others some distance north of Sixth street heard the noise of the train when it was still south of Eighth street. We quote from appellant's brief:

"The law of this State was settled at an early day, and has been repeatedly followed by the decisions of this court, to the effect that a railroad crossing is ever a warning and notice of danger to any person intending to pass over the same. It is the duty of such person to make use of his senses, both of hearing and sight, and if for any reason either of these senses cannot be rendered available, the obligation to use the other is then the stronger, in order that such person may ascertain whether a train is approaching in dangerous proximity to such crossing before he places himself in a position of danger. If such person neglects to take these precautions, and ventures blindly upon the track, it is at his own risk. The law requires a great degree of care to be exercised in making these crossings. Where a person is familiar with the surroundings existing at a railroad crossing, and knows that a regular train is due at that time, he is under the highest possible obligation to observe such precautions as are needful to avoid a collision. In the case at bar a greater degree of care was imposed upon the decedent from the fact that he knew the conditions there existing, knew that a train was due at that time, and that his view to the south was in a degree obstructed. It was clearly his duty to bring his horse to a standstill while he was yet in a place of safety, in order that the noise made by his wagon as he drove along might cease, and he be given an opportunity to determine whether the fast passenger train then due was in close proximity to the Sixth street crossing. He did not stop, and, under the repeated decisions of this court, was guilty of contributory negligence as matter of law."

Counsel cite many of our decisions and quote from the following: *Haas* v. *Railroad Co.*, 47 Mich. 401-

407 (11 N. W. 216) ; *Brady* v. *Railroad Co.*, 81 Mich. 616-623 (45 N. W. 1110) ; *Shufelt* v. *Railroad Co.*, 96 Mich. 327-329 (55 N. W. 1013) ; *Jensen* v. *Railroad Co.*, 102 Mich. 176-180 (60 N. W. 57) ; *Phillips* v. *Railway Co.*, 111 Mich. 274-276 (69 N. W. 496, 66 Am. St. Rep. 392). Appellant's counsel further say:

"Counsel for plaintiff may say that there is a presumption of law in this State that a person killed at a railroad track did stop, look, and listen. We admit there is such presumption, but say that when, as in the case at bar, there is affirmative, direct, and credible testimony that deceased went upon the track without stopping to look and listen, such presumption is rebutted and displaced."

And the following cases are cited: *Mynning* v. *Railroad Co.*, 64 Mich. 93 (31 N. W. 147, 8 Am. St. Rep. 804) ; *Underhill* v. *Railway Co.*, 81 Mich. 43 (45 N. W. 508) ; *Schremms* v. *Railroad Co.*, 145 Mich. 190 (108 N. W. 698, 116 Am. St. Rep. 291) ; *Schwartz* v. *Railroad Co.*, 153 Mich. 40 (116 N. W. 540, 17 L. R. A. [N. S.] 1253) ; *Baker* v. *Delano*, 191 Mich. 204 (157 N. W. 427).

Upon this point counsel for appellant urge in conclusion that in the instant case there is no presumption that decedent was in the exercise of due care, because the testimony of Frank Reynolds, John McKay, Joseph Mow, Caroline Mow, Fred C. Anderson, Ed. Truedell, and Joseph P. Stanch shows clearly that he did not exercise such care as the law required.

It can be said that the plaintiff introduced no testimony showing what care and caution decedent exercised in approaching the crossing, nor was it shown whether he stopped his horse and looked or listened. Upon the testimony as the plaintiff left it, the jury might have inferred that decedent approached the track with due care, or at least they might have relied upon the presumption of law above referred to. Was

this presumption overcome by evidence? Upon this subject, and after referring to the witnesses named by appellant, counsel for the plaintiff say in reply:

'In view of the confident assertions made by counsel, we are obliged to refer somewhat at length to the testimony of these respective witnesses, and direct the court's attention to this important question: 'At what point did these witnesses see the decedent?' The only time that witness Frank Reynolds saw the decedent was when he was passing through the 20-foot space, as he puts it: 'I had a view of about 20 feet there while he was passing in front of me. * * * I couldn't see Mr. Charles Cinadar when he went on the track; he had gone out of my sight.' The most, therefore, that can be claimed from the testimony of this witness is that Cinadar did not stop while he was passing this 20-foot space. Whether he had stopped before or after is not known, and no one testifies either way on that question.

"Mrs. Mow is referred to as supporting their contention that Cinadar did not stop. On cross-examination she was asked: 'And the first you saw of him was on the main track just before he was hit?

" 'A. Yes, sir.

" 'Q. Now, that is true, isn't it?

" 'A. Yes, sir.'

"This apparently was not satisfactory to counsel, and on redirect examination she was again asked:

" 'Q. Now, Mrs. Mow, so that there may be no mistake, where was the horse when you first saw it?

" 'A. Well, it was right on the main track walking.

" 'Q. How?

" 'A. He was on the track, hind feet, and the man was right on the main track when I saw him.'

"In other parts of her testimony this witness declares that the horse had not yet reached the track, but here the question was put to her directly, first on cross-examination, and later by her own counsel, and on both occasions she declared the horse was on the main track when she first saw it. And finally she says: 'He gave the danger signal just before he struck him. That attracted my attention to the man. * * * When the engineer blew the whistle I knew it was

danger. I looked up the track.' It is apparent, therefore, that this witness was paying no attention until she heard the danger signal and then discovered the horse on the track, as she says.

"Fred C. Anderson says he heard the engineer giving signals the minute he saw the horse coming up. In the conclusion of his testimony he says: 'The first I saw of the horse it was west of the box car. I couldn't tell just where it was. I looked and the train came up and hit him.'

"Ed. Truedell testified:

" 'Q. Did you testify before the coroner's inquest the first you saw the horse he was on the main track?

" 'A. Yes; just driving across.

" 'Q. That was the first you saw of him, just driving across?

" 'A. Yes, sir.'

"Joseph P. Stanch says: 'I think the first I saw of the horse and man was when the horse was on the track; I mean the main track.' There is not, therefore, a single line of the testimony of any of these men that Cinadar did not stop and listen for the approaching train. There remains only the testimony of Mr. McKay, the engineer. He could see nothing until he had reached the open space between the two box cars, as he says: 'When I reached a point where I could see through an open space, I saw him driving up west toward the track.' It is apparent, therefore, that Cinadar was at the time east of the east side of the box car. Witness then says: 'I gave six or seven sharp blasts of the warning whistle. I first saw him when he was east of the box car. The engine was coming up Main street. I was on the right-hand side of the cab. That would be about Seventh street, after I had seen him. I looked at him. The box car was in between us.

" 'Q. And the second time you gave the signal that was the last time, you say you were then about 30 or 40 feet of this track where he was hit?

" 'A. Yes, sir.

" 'Q. He was about 15 feet east of the track?

" 'A. Yes, sir; I only gave one danger signal when I saw him; he was east of the car and was on Sixth street.

" 'Q. Then he was east of the track how many feet would you say, 30 or 40, at that time when you gave him the danger signal, when you gave him these signals at Seventh street, these five or six sharp blasts, as you say?

" 'A. I don't know whether it was right there at Seventh street, it was when I could see him.

" 'Q. When you could see him east of the box car?

" 'A. Yes, sir.

" 'Q. Well, wouldn't that be about 30 or 40 feet east of the main line?

" 'A. Thirty or 40 feet east of the main line.' "

We have examined all of the testimony with great care. Some parts of the testimony are inconsistent with other parts. If we should consider the testimony most favorable to the plaintiff upon this question, it must be said that, aside from the time decedent was passing the opening of 20 feet, and when he was on the main track in a place of danger, no one accounts for him. It is decedent's conduct prior to reaching the danger zone, the track, that is material, and it is urged by plaintiff that there is no direct testimony on that point, and that the presumption of law is that he did stop, look, and listen. It is the claim of the plaintiff that it was impossible for decedent to have seen the train until he had cleared the extreme westerly side of the box car, and then his horse was on the track. While we consider the question of contributory negligence a close one, we are of the opinion that it cannot be said that the decedent did not exercise the care that an ordinarily prudent man would have exercised under like circumstances, and we think that the question was properly submitted to the jury. *Schremms* v. *Railroad Co., supra.*

2. Were the crossing signals given? The testimony upon this subject is so voluminous that we cannot quote it here. We have examined it with great care. A number of witnesses testified pro and con upon this

issue. There is much discussion by counsel of "negative" and "affirmative" testimony. The claim of the appellant is that plaintiff wholly failed to make out a case, and that there was no evidence that warranted the trial court in submitting the question to the jury; that plaintiff's proof was negative testimony of no probative force, creating no conflict of evidence, and hence presenting no question for the jury. The real question is: "Were signals given at the time and place?" This question can find its answer from those in a position and under such conditions that they probably would have heard the signal if given.

"The courts have often been asked," says Wigmore, "to exclude testimony based on what may be called negative knowledge; i. e., testimony that a fact did not occur, founded on the witness' failure to hear or see a fact which he would supposedly have heard or seen had it occurred. But there is no inherent weakness in this kind of knowledge. It rests upon the same data of the senses. It may even be sometimes stronger than affirmative impressions. The only requirement is that the witness should have been so situated that in the ordinary course of events he would have heard or seen the fact had it occurred." 1 Wigmore, Ev. 664; 2 Elliott, Ev. 969.

In *Crane* v. *Railroad Co.*, 107 Mich. 511 (65 N. W. 527), it was held that testimony of persons who were near a railroad crossing at the time of an accident, and whose attention had been directed to an approaching train, that they did not hear the train whistle for the crossing, was sufficient to justify a finding that the whistle was not sounded, although other witnesses testified positively that the signal was given. The jury are to take all the facts and circumstances into consideration. This rule was again stated in *Lonis* v. *Railway Co.*, 111 Mich. 458 (69 N. W. 642). The Michigan cases cited by appellant are reviewed in *Tietz* v. *Railway Co.*, 166 Mich. 205 (131 N. W. 710), and

the rule as declared in the *Lonis Case* approved. See, also, *Hinkley* v. *Railway Co.*, 162 Mich. 546 (127 N. W. 668).

We are of the opinion that the testimony upon this branch of the case presented a question of fact which was properly submitted to the jury.

We find no reversible error in the record, and the judgment of the circuit court is affirmed.

KUHN, OSTRANDER, BIRD, MOORE, STEERE, BROOKE, and PERSON, JJ., concurred.