ROTTER *v.* DETROIT UNITED RAILWAY.

1. STREET RAILWAYS—SURVIVAL ACT—PERSONAL INJURIES—CROSSING ACCIDENT—NEGLIGENCE—QUESTION FOR JURY.

In an action against a street railway company and a brewery company, under the "survival act" to recover damages for personal injuries resulting in the death of plaintiff's decedent, a boy about 15 years of age, caused by a collision between a street car and a brewery truck at a crossing on a public street, testimony that the street car was traveling at an excessive rate of speed in violation of the city ordinance, that the car was not under control, and as to whether the motorman attempted to slacken the

speed of the car was a disputed question, as was also the testimony with reference to the speed and handling of the truck by the employee of the brewery company, *held*, sufficient to carry the case to the jury:

2. SAME—CONTRIBUTORY NEGLIGENCE — EYEWITNESSES — QUESTION FOR JURY.

Where, in such action, it was the theory of plaintiff that decedent was injured in the absence of eyewitnesses, and therefore presumptively free from contributory negligence, sustained by the testimony of four witnesses who testified that they did not see decedent until he was discovered under the truck after the collision, and that if he had been in the position where two of defendants' witnesses placed him, viz., hitching onto the north side of the truck, riding on a bicycle, in violation of a city ordinance, they would have seen him, a question of fact as to whether there were eyewitnesses was presented for the jury. BROOKE, J., dissenting.

3. TRIAL—INSTRUCTIONS—CONTRIBUTORY NEGLIGENCE PER SE—VIOLATION OF CITY ORDINANCE.

The court below was in error in instructing the jury that a violation of the "hitching" ordinance was contributory negligence *per se*, this court having held repeatedly that the breach of an ordinance is evidence of negligence, not negligence *per se*.

Error to Wayne; Codd, J.   Submitted January 10, 1919.   (Docket No. 27.)   Decided April 3, 1919.

Case by Augusta Rotter, administratrix of the estate of Stanley Rotter, deceased, against the Detroit United Railway and the Union Brewing Company for the negligent killing of plaintiff's intestate.   Judgment for defendants on a directed verdict.   Plaintiff brings error.   Reversed.

*Harry J. Lippman*, for appellant.

*Frederic T. Harward* (*Corliss, Leete & Moody*, of counsel), for appellee railway.

*Vandeveer & Foster*, for appellee brewing company.

STONE, J.   The plaintiff is the administratrix of the estate of Stanley Rotter, deceased, and, as such, brought this action under the "survival act" to recover damages, because of the injuries to, and resulting death of, the infant decedent due to a collision of a street car of the defendant Detroit United Railway with a large

Exhibit X.

truck of the defendant Union Brewing Company at about 5:30 o'clock on the evening of November 21, 1913, at the intersection of Third street and Calumet avenue in the city of Detroit.

To aid in a clear understanding of the location of streets, intersections, etc., we here append exhibit "X" taken from the record.

Third street runs approximately north and south. The Hamilton car line runs south on this street. Third street at its intersection with Calumet avenue is 32 feet wide, from curb to curb. Calumet avenue, Canfield avenue, Forest avenue and Warren avenue, each runs east and west, Canfield being one block to the north of Calumet avenue, and is about 200 feet distant. Forest avenue is three blocks north of Calumet avenue, and Warren avenue five blocks north of Calumet. From Forest avenue to Calumet avenue and beyond, there is a gradual down grade. The intersection of Calumet avenue and Third street is spoken of as "particularly dangerous," because of the fact that Calumet ends at Third street, and is but 26 feet wide from curb to curb, and there being a block of stores on the east side of Third street at the head of Calumet avenue; and a large brick store building being situate at the northwest corner of Third street and Calumet avenue. Upon the southwest corner of these streets there stood a large street arc light.

This point was at the time in question in a thickly populated district, and a large number of persons and vehicles were constantly passing and repassing. The street car in question was a regulation "pay-as-you-enter" car, with folding doors, the motorman's vestibule being separated from the body of the car by a partition, and it was in charge of one Frank L. Fox as motorman. On the evening in question the street car left the car barns at 5:10 p. m., proceeded to Holden avenue where passengers from the shops of

the Burroughs Adding Machine Company were picked up, the car having waited there about 8 minutes, leaving at 5:20 p. m.   From Holden avenue to Calumet avenue is a distance of 11 blocks.   The street car traveled these 11 blocks, making stops at Warren and Forest avenues, loading and unloading passengers— the car going south or down town, and the collision taking place about 5:30 p. m.

The intersection of Calumet avenue and Third street was well lighted by lights in the stores and the arc light, one being able to see plainly from Forest avenue to Calumet avenue.   The conductor of the street car testified that:

"It would be safe to say that standing at the point of the collision, at that particular time, one could look north up the car track, and see as far as Forest avenue.   There is nothing there to obstruct your view."

The automobile truck in question was a large 3-ton 4-cylinder Packard truck, being used by the defendant brewing company in the delivery of its beer, and at the time of the collision was in charge of a driver and helper.   The truck was loaded with empty beer barrels, weighing about one ton.   At the time of the collision the truck had emerged from Calumet avenue going in an easterly direction, was part way across the street car tracks of the defendant Detroit United Railway, it being the intention of the driver of the truck to turn north on Third street, and to go east on Canfield avenue.   The truck was struck in about the middle by the car and was shoved to near the east curb of Third street, the street car after the collision having proceeded south probably about 25 feet before coming to a stop.   After the collision the location of the truck is indicated by the letter "M," and the location of the street car by the letter "N," in exhibit "X."   Before the collision the motorman jumped from the car, and it was a disputed question whether the

gong was sounded and the brakes applied. At the time of the collision the street car was being run as a "tripper"—an extra car to carry workmen home from work—and as soon as loaded the car would go directly down town. After the collision the little boy, the decedent, then in the employ of the Western Union Telegraph Company as a messenger boy, was found under the truck close to the east curb of Third street, with beer barrels all around, and there is some testimony that some of them were on him, the bicycle which he is supposed to have been riding being found between the beer truck and the east curb of Third street. Being severely injured, the boy was at once taken to Grace Hospital where he died from his injuries 51 hours thereafter, having been conscious most of the time. In his employment he was earning $10 to $12 per week. He attended night school, studying woodwork in the hope of becoming a pattern maker. He was an exceptionally bright and industrious boy.

It was the claim and theory of the plaintiff, upon the trial, that the decedent was injured in the absence of eyewitnesses; witnesses being produced and sworn who were in a position to observe, and who testified positively that the boy was not seen before the accident, but was first discovered under the truck after the collision.

Upon the trial it was also the claim of the plaintiff that the decedent was injured as a direct result of the collision of the street car of the defendant Detroit United Railway and the automobile truck of the other defendant, in the absence of eyewitnesses; and in support of this claim the plaintiff introduced testimony upon the question as to whether the boy was seen immediately prior to the collision.

Defendants defended upon the grounds, among others, that the whereabouts of the decedent at the time of the collision were known; that it was not shown

that the decedent was free from contributory negligence; and that at the time of the collision decedent was "hitching onto" the truck, on the north side thereof, in violation of a city ordinance, and therefore was negligent *per se,* and could not recover.

The plaintiff, in support of the claim that the decedent was injured in the absence of eyewitnesses, introduced the testimony of four witnesses: Spencer H. Roys, Richard Fenn, Jesse Stevenson and Frank L. Fox, the motorman at the time of the collision, all of whom testified with positiveness that the boy was not in the position claimed by the defendants.

It was the testimony of the witness Roys that just prior to the crash of the collision he was standing in front of a partition in the back room of his store, at the northwest corner of Third street and Calumet avenue, mixing chocolate, standing close to the glass door, and was looking out upon Calumet avenue and saw the truck passing by, going towards Third street. Upon direct examination he testified as follows:

"At about five-thirty o'clock I was in the back part of my store. There is a door in the back part of the store that has glass windows in it, and it looks out upon Calumet.

"*Q.* At that time when you were in the back part of this store did you look out through the door and see a truck pass on Calumet?

"*A.* Yes. It was a big truck loaded with beer kegs, and it was going towards Third on the right side of Calumet, going at between four and five miles an hour.

"*Q.* You saw it pass?

"*A.* Yes, I was making chocolate, that is, I had a little stove in front of the window, and I saw it go by."

Upon cross-examination he testified as follows:

"*Q.* Did you see any boy when the truck went by?
"*A.* No.

"*Q.* You did not see the boy until he was taken from underneath the truck?
"*A.* No."

Upon redirect examination he testified as follows:

"*Q.* Mr. Roys, this is Calumet, and you saw the truck pass towards Third?

"*A.* Yes.

"*Q.* Did you see any boy around that truck?

"*A.* No, sir, I didn't.

"*Q.* Did you see a boy anywhere around the truck seated on a bicycle?

"*A.* No.

"*Q.* If there had been a boy seated on a bicycle, hanging onto that truck, would you have seen him as you looked out?

"*A.* I would have.

"*Q.* And you saw no boy?

"*A.* No.

"*Q.* You saw no bicycle?

"*A.* No."

The witness Richard Fenn testified, on direct examination, that at the time of the collision he resided on Third street about half a block from Calumet avenue, and on the evening in question he left his home at about 5:30 o'clock to go to the grocery store on the east side of Third street directly opposite Calumet avenue. He said:

"As I arrived on the east side of Third street, and when I was directly in front of the Busy Bee grocery store, I looked north and saw a street car between north and south Canfield avenue; Canfield avenue jogs off at Third street. At the same time that I noticed the street car, I noticed a truck stopping at Calumet and Third, in a direct line with the sidewalk on the west side of Third. The truck did not entirely stop, but it slowed down almost to a stop. It then started up, again and proceeded east, and as it crossed the intersection swung around and started north on Third avenue. The truck, as it crossed the intersection, made a full wide swing. When I saw the truck come almost to a stop the street car was opposite to southern Canfield. That is that portion of Canfield avenue going toward Woodward avenue from Third. The front of

the street car was opposite the southern curb of south Canfield, which would be opposite 'B' on the plat. The front of the truck stopped in line with the sidewalk on the west side of Third. I was at the point marked 'J' on the map, and when I stood at 'J' I saw the street car at point 'B.' I saw the truck slow down at point 'A.' After I saw the street car and the truck, I did not go into the grocery store. I watched it. The reason that I watched it was that I was sure something was going to happen. I had a strange feeling that something was going to happen. I do not know what gave me that feeling, but it was at the same instant that the street car was coming down that the truck started up, and I stood there and watched. * * * The street car was carrying a standing load. The collision smashed the front end of the street car completely. I did not see the motorman before the crash, but after the crash, I saw him go back in the front of the car and shut off the motor. Point 'G' on the map is the intersection of Third street and Calumet. The point of collision is at point 'K' designated on the map. When the street car hit the truck it pushed the truck off the track. The position of the truck after being hit was at point 'M.' The front of the truck was closer to the curb on Third. The rear of the truck was about three or four feet from the track. After the collision at point 'K' the street car went past the point of collision to about point 'N.' After the collision the truck was in position 'M' and the street car was in position of 'N.'

"Q. As you looked up Calumet avenue did you have a clear, unobstructed view of this truck as it approached?

"A. Yes.

"Q. Did you see any boy anywhere around there?

"A. No.

"Q. If there had been a boy anywhere around there in connection with that truck would you have seen him?

"A. Yes. After the collision I heard screams; I was too frightened to do anything and I stood still. After hearing the screams I saw the boy, and he was under the middle of the beer truck."

Upon cross-examination by the defendant Detroit United Railway the witness testified:

"I saw the car strike the truck.

"*Q.* Is that all you saw?

"*A.* I saw it approaching it.

"*Q.* And you had a funny feeling because you knew it was going to hit it?

"*A.* Yes.

"*Q.* And you had that funny feeling before it hit it?

"*A.* Yes.

"*Q.* After you had that feeling you turned?

"*A.* No.

"*Q.* Did you watch them?

"*A.* I watched them come together.

"*Q.* You knew they were going to come together?

"*A.* Yes."

Upon cross-examination by the defendant Union Brewing Company the witness testified:

"When I first saw the street car it was up towards Canfield avenue. At that time I was on the east side of Third avenue. I was facing in a westerly direction, with my back to the east, and I could see west perfectly. I saw the street car coming at about 25 miles an hour. The intersection of Calumet and Third was well lighted up by means of an arc light and lights from the windows in the stores. I had no difficulty in seeing everything that took place there.

"*Q.* Now, you say that you looked in a westerly direction and you saw the automobile truck coming east on Calumet?

"*A.* Yes.

"*Q.* And was there any other vehicle on Calumet avenue at that time?

"*A.* No.

"*Q.* The only one that you could see was the truck?

"*A.* Yes.

"*Q.* That is the only thing that you saw there?

"*A.* Yes.

"*Q.* You did not see the boy to the south of the automobile truck?

"*A.* No.

"*Q.* Then did you see the boy on the wheel to the north of the truck when he was on Calumet?

"*A.* No.

"*Q.* Nor was there a boy on the wheel in front of the automobile on Calumet?

"*A.* No.

"*Q.* And when that machine approached Third ave- nue you at no time saw a boy in close proximity to the truck?

"*A.* No.

"*Q.* Now did you see any vehicle going north on Third avenue as you looked towards the street car ap- proaching at 25 miles an hour?

"*A.* No.

"*Q.* If there had been any going north on Third avenue it would be on the right side?

"*A.* Yes.

"*Q.* Now, as the car approached you, did you see anybody on a bicycle, or a bicyclist on the west side of Third avenue, going in a southerly direction?

"*A.* No.

"*Q.* So as you stood there facing the west you could see an automobile coming, and at the same time there was a street car coming?

"*A.* Yes.

"*Q.* And you had a feeling that probably a collision was going to take place?

"*A.* Yes.

"*Q.* And you stood in that position where you could see what took place?

"*A.* Yes.

"*Q.* Now, the accident happened almost directly un- der the arc light, didn't it?

"*A.* Yes.

"*Q.* And you saw and heard the impact?

"*A.* Yes.

"*Q.* And you saw the collision?

"*A.* Yes.

"*Q.* And at that time were you in a position where you were facing almost to the west?

"*A.* Yes.

"*Q.* So that you could see a few feet to the right of the automobile, and also you were brought within

a few feet of the left side of the automobile to the south?

"*A.* Yes.

"*Q.* Did you see just at the time of the accident, a boy riding on a wheel go to the left of the automobile, or to the right of the automobile, or to the south of it?

"*A.* No, sir.

"*Q.* You did not see any boy at all?

"*A.* No.

"*Q.* If the boy had been to the south of the automobile when it was right by the street car, would you have seen him?

"*A.* Yes.

"*Q.* Just before the crash took place, did you see a boy to the south of the automobile?

"*A.* No.

"*Q.* You did not see the boy thrown underneath the automobile?

"*A.* No.

"*Q.* If he had been thrown under the south side you would have seen it?

"*A.* I cannot say as to that. The point of collision was in the light, I looked west, I saw no small boy at all, there was nothing to obstruct the view if the boy had been thrown under the truck from my side."

The witness Jesse Stevenson, at the time of the collision, stood in the front part of Roys' store at the northwest corner of Third street and Calumet avenue, looking out upon Third street, and saw the street car pass the front of the store and strike the truck. Upon direct examination he testified as follows:

"*Q.* Did you see the boy at all, before you saw him under the truck?

"*A.* No. * * * The street car hit the truck right behind the front wheel, pretty close to the center; the truck had come down Calumet and was pointed toward Canfield. I was looking right at the truck when it was struck and I could not help seeing it."

Upon rebuttal the motorman was recalled under the statute, and testified as follows:

"*Q.* Now, Mr. Fox, it is a fact, isn't it, that you were looking out of your window on this particular day, and that you saw the north side of the truck as it was going towards the track?

"*A.* Yes.

"*Q.* You looked that way?

"*A.* Yes.

"*Q.* And you saw the truck?

"*A.* Yes.

"*Q.* You say that you saw the truck from the nose of it to the tail of it, facing the street car?

"*A.* Yes.

"*Q.* Now, if there had been a boy at any point alongside of the truck, between the nose of it and the tail of it, you would have seen the boy, wouldn't you?

"*A.* Yes.

"*Q.* You also say, then, do you not, that there was no boy between the front of the truck and the tail of the truck, as you saw the truck about to approach this track?

"*A.* No, sir, there was not."

Upon cross-examination he testified as follows:

"*Q.* You mean none that you saw.

"*A.* No, sir, I did not.

"*Q.* You will not say that the boy was not there?

"*A.* No, I don't know that he was there, but he was not there that I know of; no, sir, he was not there.

"*Q.* Could he have been there and you not see him on account of the happening so quickly of that accident?

"*A.* I did not see him."

On redirect examination he testified as follows:

"*Q.* Could he have been on the north side of the truck between the front and back of it, unless you had seen him when you were looking?

"*A.* No, sir.

"*Q.* Would you have had to see him?

"*A.* Yes.

"*Q.* And he was not there?

"*A.* No.

"*Q.* You will say he was not there?

"*A.* Yes."

The defendants' witness James W. White testified that on the day and hour in question he was in the vicinity of Calumet avenue and Third street; that he was on his wagon, traveling on the west side of Third avenue between Canfield and Calumet avenues, going south, and that the street car passed him when about 50 or 60 feet from Calumet avenue; that he saw the truck appear from Calumet avenue going east and that it didn't stop; that he saw a boy on a wheel, about which he testified as follows:

"*Q.* Did you see a boy on a wheel?
"*A.* I did.
"*Q.* Where was he?
"*A.* On the north side of the truck.
"*Q.* And what was he doing?
"*A.* He had his hand on the truck.
"*Q.* What did the truck do?
"*A.* It went right across the track.
"*Q.* In what direction?
"*A.* There is a blind street there, it made a turn and started to approach Canfield on the east side of Third avenue.
"*Q.* It made a long turn?
"*A.* Yes.
"*Q.* Did the boy continue where he was?   Where was the boy?   With his hand on the truck?
"*A.* I should say he was just probably a little ahead of the rear wheel.
"*Q.* What was he riding?
"*A.* A bicycle.
"*Q.* He was riding a bicycle?
"*A.* Yes.
"*Q.* When this automobile or whatever it was—
"*A.* It was a beer truck.
"*Q.* Loaded with anything?
"*A.* Empty kegs.
"*Q.* When this truck came over the first rail of the track, how far away was the street car from it?
"*A.* I should judge 45 or 50 feet.
"*Q.* Did the boy on the wheel stop before he went on the track?

"*A.* I cannot say as to that, but he was there after I got up there—there was going to be a collision and the boy was under the truck after it.

"*Q.* Did you see them as they went on the track?

"*A.* Yes.

"*Q.* The boy and the automobile?

"*A.* Yes.

"*Q.* Did either of them stop before they went on the track?

"*A.* No."

On cross-examination he testified that the boy was pedaling along hanging on the truck with his right hand, and pedaling.

"*Q.* The only thing you know is that the automobile was going about 10 or 12 miles an hour, and the boy was clinging to the side of the truck, and the collision took place and the boy was hurt?

"*A.* Yes."

There was more testimony of this witness, but it was to the effect as above stated.

The witness Wilbur Jessop, called by the defendants, testified that he was going east, on the south side of Calumet avenue, and that when the accident occurred he was about 20 feet off of the curb of Third street on the south side of Calumet; that he saw the truck as it went by him, and as the truck turned he saw the boy upon the north side of the truck, coasting along with his right hand hold of the truck, and the substance of his testimony was, that the boy was upon the left side, or north side of the truck holding on, and was in that position as the truck made the swing to turn north on Third street.

There was testimony tending to show that the street car was traveling at an excessive rate of speed, and in violation of the ordinance of the city; and that the motorman did not have the car under control. Whether he attempted to slacken the speed of the car was a disputed question, as was the testimony with refer-

ence to the speed and handling of the truck by the defendant the Union Brewing Company.

Upon the subject of negligence of the defendants there was, in our opinion, sufficient evidence in support of the declaration to carry the case to the jury. We do not think there was any evidence of gross negligence of either defendant.

At the close of all the testimony, counsel for the defendants made a motion for a directed verdict on the ground that, as matter of law, the deceased was guilty of contributory negligence which must defeat recovery in the case. Counsel for the plaintiff insisted that the case was, under the evidence, a proper one for the consideration of the jury. The court granted the motion of the defendants; and in its charge directing a verdict for the defendants, after referring to the duty of the decedent to stop, look and listen before entering upon the street car track, said:

"There has been, unfortunately, in this case no testimony introduced as to compliance, on the part of this unfortunate young man, with these duties. There has been positive testimony, however, of Mr. White and Mr. Jessop, Mr. White testifying that the boy was coming down and was coasting alongside the beer wagon, and had his hand on the wagon—was hitching —that is a direct violation of the ordinances of the city of Detroit and is an act of contributory negligence. For myself to entirely disregard that testimony would be a violation of my oath of office. This testimony and the testimony of Mr. Jessop is the only testimony of any person who saw this accident. Both testify that he was not going up Third avenue on the east side of Third avenue where he had a right to be, but it is the positive testimony that he was going down Calumet avenue with his hand on the side of the wagon. An unfortunate thing that too many boys do; in doing it they deliberately take their own lives in their hands, and to establish any precedent that a recovery could be had, when an accident happened by reason of such action would be to invite people to

deliberately disregard our laws to their own detriment. It becomes my duty, therefore, not to allow and it is your duty not to allow sympathy to enter into our deliberations in this case, for the reason that exact justice is never meted out when we do. If we allow sympathy to enter into our judgment, exact justice cannot be done. For me to do it would be for me to violate my oath of office. I have no right to put before you a temptation to allow sympathy to enter into your deliberation. I cannot see how the testimony of Mr. White and Mr. Jessop can be set aside by any man unless his vision is clouded by sympathy. Under these circumstances it is therefore my duty to relieve you of all further consideration of the case, and direct that you return a verdict of not guilty for both of the defendants."

Whereupon, without leaving their seats, the jury returned a verdict of not guilty as to both defendants, and a judgment in accordance therewith followed.

The ordinance referred to by the court in its charge reads as follows:

"It shall be deemed a violation of this ordinance for any person to hitch onto, or get upon or take passage on, any vehicle which is passing through or upon any of the streets of this city, without the consent of the driver or operator of such vehicle."

It should be stated also that both the driver of the truck and his helper testified that they saw no boy at or around the truck as they approached Third street, and therefore gave no consent upon the subject.

The plaintiff has brought error, and there are many errors assigned to the rulings of the court upon the introduction of testimony. We have examined the same and find no reversible error in that regard. The 37th assignment of error is that the court erred in refusing to submit to the jury the questions of fact raised by the evidence. The 38th is that the court erred in taking the case from the jury, and in direct-

ing a verdict in favor of the defendants and against the plaintiff, of no cause of action.

In discussing the questions relating to the charge raised by the said assignments of error, it is urged by the plaintiff that the testimony presented a question of fact for the jury to pass upon, as to whether or not there were eyewitnesses to the injury received by the decedent; and counsel urges that as there were four witnesses, all in a position as to time, place and circumstances, to observe what occurred, who saw and testified that the boy was not there about the truck, against two witnesses who say he was there as the truck made the turn across the track, a question for the jury was raised; and that the court erred, also, in charging that the boy, having hold of the truck, or "hitching onto" it, was guilty of contributory negligence *per se*. Many cases are cited by counsel upon both sides.

It is the claim of counsel for the defendants that the case is controlled by *Baker* v. *Delano*, 191 Mich. 207, and they quote from the opinion of Justice KUHN in that case. Indorsing all that this court held in that case, we do not think it controlling of the instant case. The uncontradicted evidence in that case showed that there were eyewitnesses of the accident who were able to, and did, give direct testimony on the subject, and, consequently, under the authorities there cited, the presumption relied upon by the plaintiff was removed.

In the instant case whether or not there was an eyewitness, or were eyewitnesses to this injury, involved a question of fact. Four witnesses, who were in a position to see what occurred, testified positively that had there been a boy where the defendants' witnesses placed him, they would have seen him. It is unnecessary to raise or discuss any fine spun theory as to whether this evidence was positive or negative in its

character. We have passed that question, and it seems to us that the real and meritorious point here is, whether or not there was a question of fact for the jury to pass upon, namely, the question of who testified correctly upon this issue.

This court said in *Woodin* v. *Durfee,* 46 Mich. 424, at page 427:

"A jury may disbelieve the most positive evidence, when it stands uncontradicted; and the judge cannot take from them their right of judgment."

If this is true as to uncontradicted evidence, it is doubly true, in a case like this, where the evidence is in conflict. Upon this subject the plaintiff has cited the following cases: *McDuffie* v. *Railway Co.,* 98 Mich. 356; *Lonis* v. *Railway Co.,* 111 Mich. 458; *Cinadar* v. *Railway Co.,* 193 Mich. 38.

What this court said in the *Cinadar Case,* on page 48 *et seq.,* is, in our opinion, applicable here. Many other cases are cited by counsel, including *Rhoades* v. *Railway Co.,* 58 Mich. 263, where it is held that where such evidence conflicts the weight thereof is for the jury.

That questions relating to plaintiff's contributory negligence should be submitted to the jury when the testimony is conflicting, plaintiff's counsel also cites *Haines* v. *Railway Co.,* 129 Mich. 475, where nearly a score of cases are cited in the opinion. A case very much in point, also, is *Tietz* v. *Railway Co.,* 166 Mich. 205, where the rule laid down in the *Lonis Case* is reiterated.

It is hardly necessary to go outside of our own jurisdiction, but attention is called to the case of *Baltimore & Ohio R. Co.* v. *O'Neill,* 108 C. C. A. 115, 186 Fed. 13, where the same doctrine is announced with reference to a headlight, and a number of our cases are cited, including the *Lonis Case.*

We are of the opinion that the state of the record did not justify the trial court in directing a verdict for the defendants upon the ground stated, or upon any ground appearing in the record. The question should have been submitted to the jury as to whether there was evidence of the contributory negligence of the plaintiff's decedent, the evidence upon the subject being conflicting.

We think it was also error for the court to instruct the jury that a violation of the "hitching" ordinance was contributory negligence *per se,* for this is really what the charge means. This court has held repeatedly that the breach of an ordinance is evidence of negligence, not negligence *per se.* See the language of Justice BROOKE in *Scott* v. *Dow,* 162 Mich. 636, at page 640, citing *Blickley* v. *Luce's Estate,* 148 Mich. 233. Upon this point may be cited the following cases: *Taylor* v. *Railroad Co.,* 45 Mich. 74 (40 Am. Rep. 457) ; *Cook* v. *Johnston,* 58 Mich. 437 (55 Am. Rep. 703) ; *Flater* v. *Fey,* 70 Mich. 644; *Haines* v. *Railway Co., supra;* *Sterling* v. *City of Detroit,* 134 Mich. 22; *Mollica* v. *Railroad Co.,* 170 Mich. 96, 100 (L. R. A. 1917F, 118) ; *Westover* v. *Railway Co.,* 180 Mich. 373, 378; *Weber* v. *Beeson,* 197 Mich. 607.

In *Cook* v. *Johnston, supra,* Justice CAMPBELL, speaking for this court, used the following language:

"The court also charged the jury that a violation of the city ordinance requiring ashes to be kept in metallic or other incombustible vessels was negligence in law, for which defendant would be liable; and this was emphasized by the further statement that if this was not done she was not responsible in this case.

"This doctrine is not maintainable as stated. The primary object of municipal ordinances is public and not private, and their violation is redressed by the legal penalties. *Taylor* v. *Railroad Co., supra.* City ordinances are necessarily made general, and impose duties which in a given case may be of no special importance. It is quite possible that under certain circumstances, and in various surroundings, it is in

no way dangerous to put ashes in wooden barrels, and it can never be dangerous to put cold ashes in them. It is certain that ash-barrels are and always have been more or less used. Whether the use of them is culpably negligent in a given case must usually be a question of fact to be determined by the jury on the facts, and not by the court."

In *Weber* v. *Beeson, supra,* Justice BIRD, in a unanimous opinion, said:

"But it is said that the testimony is uncontradicted that plaintiff was violating the ordinance as to the rate of speed he was traveling while crossing the intersection. We have held that a violation of an ordinance was merely evidence of negligence. (Citing cases.) Whether the speed of the motorcycle caused or contributed to the accident was, in connection with the other facts, a question for the jury. We think it is clear upon the whole record that the question of contributory negligence of the plaintiff was one for the jury."

Many other alleged grounds of error are discussed by counsel for appellant. Such of the questions as are likely to arise upon a new trial we have examined, and think the objections are without merit. We think there was evidence tending to show negligence of the defendants, as alleged, sufficient to carry the case to the jury.

For the errors above discussed, we are constrained to reverse the judgment of the court below and grant a new trial, with costs to the appellant.

BIRD, C. J., and MOORE, STEERE, FELLOWS, and KUHN, JJ., concurred with STONE, J.

BROOKE, J. I am of opinion that the evidence adduced at the trial warranted the direction of a verdict upon the ground assigned therefor.

OSTRANDER, J., did not sit.