PAMBURN *v.* MICHIGAN CENTRAL RAILROAD CO.

RAILROADS—NEGLIGENCE—CROSSING ACCIDENT—CONTRIBUTORY NEGLIGENCE—DIRECTED VERDICT.

> In an action against a railroad company for personal injuries received when plaintiff's automobile, in which he was riding, was struck by defendant's locomotive at a public crossing, where it appears from the evidence that, had plaintiff, who was familiar with the surroundings, approached the crossing slowly, he could have stopped before reaching the track after he had reached a point from which he could plainly see the approaching train, he was guilty of contributory negligence as a matter of law.[1]

Error to Saginaw; Snow (Ernest A.), J. Submitted June 10, 1924. (Docket No. 32.) Decided October 6, 1924.

Case by Oscar A. Pamburn against the Michigan Central Railroad Company for personal injuries. Judgment for plaintiff. Defendant brings error. Reversed, and judgment ordered entered for defendant.

[1]Railroads, 33 Cyc. p. 1018.

On care required of driver of automobile at railroad crossing, see notes in 21 L. R. A. (N. S.) 794; 29 L. R. A. (N. S.) 924; 46 L. R. A. (N. S.) 702.

On duty of pedestrians to look out for automobiles, see notes in 3 L. R. A. (N. S.) 345; 20 L. R. A. (N. S.) 232; 38 L. R. A. (N. S.) 488; 42 L. R. A. (N. S.) 1179.

*Humphrey, Grant & Henry,* for appellant.

*Purcell & Picard,* for appellee.

SHARPE, J.     Defendant reviews by writ of error
a judgment recovered by plaintiff for $3,000 for in-
juries sustained by him, due to a collision between
a Ford coupé in which he was riding and the locomotive
on one of defendant's north-bound passenger trains
at a highway crossing near the village of St. Charles,
in Saginaw county.     Defendant moved for a directed
verdict, for the reason that there was no competent
proof of its negligence, and also because under the
proofs the plaintiff was guilty of contributory negli-
gence.     This motion was taken under advisement and
the cause submitted to the jury, after which it was
renewed and denied and the judgment entered.

After a careful review of the evidence, and with
due regard to the rule that, where there is any conflict
in the testimony, the facts must be submitted to the
jury, we are of the opinion that the motion to direct
should have been granted for the second reason stated.

Plaintiff was a traveling salesman, 31 years of age.
He had driven the car about 9,000 miles.     He was
familiar with the situation surrounding the crossing.
About 2 o'clock on the afternoon of November 24,
1920, he started north out of St. Charles for Saginaw.
When about 90 rods north of the railroad depot, the
highway turns directly to the east and crosses de-
fendant's right of way.     In addition to the main
track, there was a side track at the point of inter-
section.     A small building, 16.3 feet by 12.3 feet,
with eaves 9.7 feet high and peak 13 feet high, used
for weighing sugar beets, was placed on defendant's
right of way 26 feet south of the center line of the
highway.     It was 18.6 feet from the east side of
this building to the west rail of the side track.     This
track was 4.7 feet between the rails, and it was 9
feet from its east rail to the west rail of the main

track, making 32.3 feet from the building to the nearest rail of the main track, on which plaintiff's car was when struck. There was a gondola car standing on the side track, the north end of which was about 75 feet from the south line of the highway. The height of this gondola was about 8.5 feet above the rail. The top of the cab of the locomotive which struck plaintiff's car was 14 feet 8 inches, and the top of one of the cars attached thereto was 14 feet 2 inches above the rail. Of the accuracy of these figures there seems to be no dispute. Most of them were shown by actual measurements taken.

The plaintiff testified:

"As I approached the Michigan Central Railroad I was driving east and drove along until I got to just at the weighing station. * * * I came right along here. And that was mighty bumpy up in here. When I got here I stopped and looked. When I started up again I started up on low. When I got right up so I could see past this house, I could see the train coming. Train must have been, I should judge it must have been sixty feet or better, ninety feet say.

"*Mr. Henry:* How much?

"*A.* Ninety feet.

"*Q.* When you first saw it?

"*A.* Yes.

"*Q.* Then what did you do, Mr. Pamburn?

"*A.* Stopped. I was on this track, my front wheel was. By the time the train was coming I couldn't get off. I stopped as soon as I could see the train coming. * * * I came to a dead stop momentarily.

"*Q.* You looked each way?

"*A.* Looked to the south; I could not see. I looked to the north. When I started up I took a glance this way. I could see the train was coming. I looked both to the north and south and I listened. My hearing was all right. I do not wear glasses. I could see through the windshield all right."

On cross-examination he testified:

"The road is straight for about 3 blocks before you

reach the crossing.     The road is not level; never was. Over 200 feet to the crossing there are no hills.     It is just the same as an ordinary country road.     There were no hills approaching the track.

"*Q.* You ran right along straight, level from the direction—

"*A.* Yes.

"*Q.* And that is true right over the crossing, is it not?

"*A.* Yes.     I stopped just at the weigh station before reaching the crossing.     Just before going on the spur track.     I judge it is 15 feet from the west rail of the main track to the east side of the weigh station. It might be a couple of feet more.     The point where I stopped my machine was right at the edge of the weigh station.     The front of my machine would be just a little past the east side of the building when I. stopped.     I just stopped momentarily.     Just stopped and started up.     I looked in both directions when I stopped.

"*Q.* Had you gone far enough beyond that weigh station so that you could see the side of the track?

"*A.* Not of the train track.     Up until I stopped at the weigh station, I might have been running the Ford 11 miles.     I could not have gone any faster. The road was in such condition you could not sit in the machine.     I was running not to exceed 11 miles an hour, stopped, started up and then after I started up again, I looked both to the north and to the south again.     I then saw the train coming from the south. I was not very far from the track when I saw the train coming.     When I saw the train, I stopped.     I could not say how fast I was going at that time.     I had it on low.     I was stopped when the collision took place—stopped before the engine hit me.     The engine was pretty close at the time I stopped—possibly 150 feet away.     The train had to move that distance before the collision took place.     From where I started at the weigh station to where I stopped on the track was 15 feet in my judgment.     I could not tell how fast I was going when I stopped.     I have driven a machine a good many years.     I do not think I was going over five miles an hour.

"*Q.* Your judgment is you were going about five miles an hour?

"*A.* Between four and five, I should judge.    When I am running five miles an hour, I can stop a Ford within half of its length.

"*Q.* Your judgment, in moving four or five miles an hour, a Ford can be stopped half of it?

"*A.* On a good, dry pavement.

"*Q.* Within what time, could you stop on that day?

"*A.* I don't know, I couldn't tell you.    I don't remember.    About—

"*Q.* You wouldn't move more than half of its length driving on that road at the time.    If you were running four or five miles an hour.    You would not go over half of its length.

"*A.* I don't know.    It might go a little more than the length of it, or could go farther.    *    *    *

"*Q.* If the train had been close enough you could have seen it over the top of the gondola, couldn't you?

"*A.* Yes.

"*Q.* As you rounded the corner of the weigh station?

"*A.* You couldn't see the entire train.    You could have seen the engine.

"*Q.* Could you see the top of the cars over the top of the gondolas?

"*A.* No, you could not see that far down there because the buildings are so you can't see it.

"*Q.* As you passed the corner of this weigh station and looked south there wasn't anything to obstruct your view except the gondola, was there?    Did you get my point?

"*A.* Yes, I get the point.

"*Q.* Was there anything to obstruct the view?

"*A.* After you get far enough past the corner you could see it.    You would have to be way by that weigh station.

"*Q.* When you are a foot past the east side of the weigh station you can see several hundred feet at the very least, right south, can't you?

"*A.* Yes."

On November 29th, five days after the accident, defendant's claim agent, accompanied by Mr. Macomber, the circuit stenographer, called at plaintiff's home in Saginaw.    At the request of the claim agent he made a statement as to how the accident happened, which was taken down by Mr. Macomber.    In it he said:

"I was driving in from St. Charles, and I met an automobile—I don't know what kind it is. Crossed the track previously, between the train and the track. There is a siding there, and so forth. * * * And then I went up to the south and met him. The road isn't very good at the present time. I looked north first. I couldn't see the train coming, I came from the bridge. I looked south. I could see the smoke of the engine over the cars that was on the south side of the road, and I stopped as quick as possible, I stopped on the track. * * *

"Q. * * * How fast were you running?

"A. I couldn't have been running very fast.

"Q. Was it over—

"A. It is a shale road; you can't run very fast over it anyway. It was, I imagine, between twelve and fifteen. * * *

"Q. Did you bring your automobile to a stop, any place near the tracks before you crossed over?

"A. No, I was driving right along.

"Q. Just slowed down?

"A. I wasn't going fast enough. I couldn't have been going over 15—between 12 and 15 is probably what I was going.

"Q. When you came up to the track, whether or not you brought your automobile to a dead stop, and looked?

"A. When I first saw the train is when I tried to stop.

"Q. How close were you to the tracks then?

"A. Pretty close.

"Q. Did you get stopped before they hit you?

"A. Yes.

"Q. How far on the track did you get?

"A. Half way over."

Winnifred Powell, the wife of a coal miner, who lives near the crossing, was the only other person who saw the accident. She watched both the train and the car as they approached the crossing. She testified:

"As I was standing on the knoll watching the train and the machine, I first saw the automobile before it reached the McKeage house. The machine was wholly in my view along that road until it reached

the little station on the side toward me.    Just for an instant out of my sight and then I saw the crossing. It came on the crossing and the smash-up followed. The machine was wholly within my sight except as it was blocked from view by that small beet station. This station was about the same size as the other one.    It was only for an instant it was blocked from view.    I saw the automobile when it went in front of the beet station on the south side of the highway.

"Q. You may state whether the automobile stopped at a point when it reached or just passed the beet station on the other side on the south side of the highway?

"A. I did not see the car stop at all.    *    *    *    I testified this morning I could not tell whether the automobile stopped or whether it did not stop before it got to the spur track.    I did not see it stop.    I do not know whether it stopped or not."

It will be noticed that plaintiff testified that when he had passed the weigh station he could see several hundred feet down the track, were it not for the gondola car which stood on the side track.    It clearly appears that, had he looked, he must have seen the approaching train over the top of this car.    The smoke stack and cab of the locomotive and the top of the cars in the train were about 6 feet higher than the gondola car.    It also appears that the gondola car stood about 75 feet from the south line of the highway.    As plaintiff passed the weigh station and approached the main track, his view to the south was constantly widening.    He was in a place of danger and required to exercise that degree of ordinary care commensurate with his danger and his surroundings. Had he stopped when he approached the weigh station and proceeded slowly "on low" at not over 5 miles an hour, as he testified he did, it is apparent that he could have stopped before reaching the main track after he could plainly see the approaching train.    If he did not stop, he was proceeding at the rate of 11 miles or more per hour, as stated by him to the claim

agent and Mr. Macomber.    In either event, he was not exercising that degree of care which the law imposed on him under the circumstances.    Plaintiff's own testimony, viewed in the light most favorable to his right of recovery, does not bring this case within the rule announced in *Fillingham* v. *Railway Co.,* 207 Mich. 644, and kindred cases.    It discloses a disregard of his own safety, not infrequent in this day, when speed seems to take the place of care on the part of drivers of automobiles, and juries must not be permitted to excuse such conduct by a failure to find contributory negligence when it is so clearly established.

The cause will be remanded, with directions to the circuit court to enter a judgment for the defendant, with costs of both courts.

CLARK, C. J., and McDONALD, BIRD, MOORE, STEERE, FELLOWS, and WIEST, JJ., concurred.